**A. T. CROSS COMPANY, Plaintiff-Appellee,**

v.

**JONATHAN BRADLEY PENS, INC., et al., Defendants-Appellants.**

**No. 440, Docket 72-2216.**

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1972.

Decided Nov. 21, 1972.

---

Leslie D. Taggart, New York City (Watson, Leavenworth, Kelton & Taggart, Albert Robin, Frank J. Colucci, New York City, and Herbert B. Barlow, Jr., Providence, R. I., of counsel), for plaintiff-appellee.

Roger M. Milgrim, New York City (Milgrim, Thomajan & Jacobs and Raymond J. Hagan, New York City, of counsel), for defendants-appellants.

Before FRIENDLY, Chief Judge, and MANSFIELD and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

Since 1868 plaintiff A. T. Cross Company (Cross) has been selling, with increasing success, mechanical pens and pencils bearing its trademark CROSS. The mark has been registered in the principal register of the Patent Office. Whether or not its quality as a surname made it ineligible for registration on the principal as distinguished from the supplemental register, cf. 15 U.S.C. § 1052 (e)(3); Kimberly-Clark Corp. v. Marzall, 196 F.2d 772, 773 (D.C. Cir. 1952), criticized in Application of Standard Elektrik, 371 F.2d 870 (C.C.P.A. 1967), the name CROSS has gained a secondary meaning with respect to mechanical pens and pencils and is thus a good trademark at least "against all others but those similarly named." 3 Callmann, Unfair Competition, Trademarks and Monopolies § 77.4(d) at 382 (1969). The Cross pens and pencils are of high quality, carry a lifetime guarantee against mechanical defects, and bear a correspondingly elevated price tag.

Cross sells both to retailers and in the "specialty" trade. In the latter the ultimate purchasers are, in the language of the district judge, "distributors and industrial concerns that buy pens and pencils in large quantity for use by the agency or company personnel or for distribution as gifts."

Defendant Jonathan Bradley Pens, Inc. (Bradley) has been selling mechanical pens and pencils in the specialty trade since 1969 when it took over Morgan Henley Pens, Inc. (Henley). Beginning in 1968 Henley and later Bradley included in their catalogues and their exhibitions at trade shows pens and later pen and pencil sets, in boxes originally labeled LaCrosse and now bearing the

legend, La Crosse by Bradley.[1] Unlike CROSS pens, the pens marketed by defendants do not carry the mark on the pens themselves. Bradley also sold pens under the marks ASTROPOINT and ASTROMATIC—names which it originated in 1969—as well as under so-called "private labels" chosen by its purchasers. The judge found that use of the mark La Crosse did not come to plaintiff's attention until early October, 1972, when Bradley sent out a mailer describing the La Crosse pen and pencil set as "Matching Gold Pen and Pencil Set with the look of simplicity. Inexpensive but looks like the high priced model." On the back of the mailer defendants said "The new La Crosse set. Sounds and looks like a more expensive set."

On learning of this, plaintiff instituted this action, wherein federal jurisdiction was predicated both upon the Trademark Act of 1946, 15 U.S.C. § 1051 et seq. and diverse citizenship. It requested and, after hearings, obtained a preliminary injunction against defendants' use of the names LA CROSSE or CROSSET. Defendants appealed and sought a stay; another panel granted this pending argument and expedited the appeal. We declined to extend the stay (except for a few days to permit defendants to take steps necessary to bring themselves into compliance), and now affirm the order granting the temporary injunction.

■■■■ Defendants' principal point, doubtless the main reason for our colleagues issuing a stay pending argument of the appeal, was that the district judge professed to have granted the temporary injunction without making the traditional conclusion that plaintiff probably would succeed on final hearing. *Cf.* Sutton Cosmetics (P.R.) v. Lander Co., 455 F.2d 285, 289 (2 Cir. 1972). His reason for declining to do this was a belief that since the individual assignment system recently adopted by the District Court for the Southern District of New York would almost certainly cause the case to remain with him, such an expression on his part would give "the appearance of judicial impropriety" and force him "to abandon the ideal of disinterested open-mindedness until all the evidence is presented." While the judge's motives were commendable, his fears were exaggerated. An expression that, on the evidence presented at a hearing for interlocutory relief which necessarily is held in some haste, the plaintiff is likely to prevail, involves no prejudgment of what the judge may decide when the entire case is in, and could not reasonably be thought to do so. The saving grace lies in the qualification that the judge is opining solely on the basis of what is then before him. In a patent infringement case recently decided, we have seen a judge who found probability of success for the patentee on a motion for a temporary injunction conclude that the patent was invalid when the issues were fully explored at trial. Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Co., 341 F.Supp. 1303 (E.D.N.Y.), aff'd, 443 F.2d 867 (1972). No difficulty such as Judge Carter envisaged has been thought to exist in districts having only a single judge, in three-judge court proceedings or in the many multi-judge districts that long preceded the Southern District of New York in adopting the individual assignment plan.

The judge's failure to formulate this conclusion is not, however, a sufficient reason for reversal. It is arguable that in fact he applied the traditional test when he said that plaintiff had established a "prima facie case of infringement" and, for purposes of decision, rejected the only two affirmative defenses proffered by defendants, laches and plaintiff's consent to the use of its mark by another, the former expressly and the latter implicitly. In any event, it would be folly to reverse the grant of a temporary injunction because of the

---

1. In the box shown us at the argument the type for "La Crosse" was discernibly larger than "by Bradley." The La Crosse pen is also ordered under the name "Crosset."

judge's failure to pronounce the usual litany if, as is the case here, we would reverse the denial of a temporary injunction as an abuse of discretion.

■■ This case does not require a weighing of the many conflicting considerations necessary in trademark cases where the products are different. *Cf.* Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2 Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed. 2d 25 (1961). Neither is there the factor of ignorance of the plaintiff's mark which, although not an ultimate defense, might lead the chancellor to deny interlocutory relief, in order to prevent hardship, until all the proof was in. When Henley began to use the word LaCrosse, it knew all about the CROSS pen and pencil, as anyone in the trade necessarily would; indeed, its president, defendant Salinger, had worked in Providence, R. I., where the CROSS pen was made. Again, while lack of deliberate intent also would not be an ultimate defense, the explanation that the name LaCrosse was chosen because of its association "with the sport LaCrosse which is a very masculine, very rough sport" deserving association with "a very masculine type of pen," seems exceedingly lame, as often is the case.[2] See Judge Moore's classic dissent in Lincoln Restaurant Corp. v. Wolfies Rest., Inc., 291 F.2d 302, 304 (2 Cir.), cert. denied, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961); and Polaroid Corp. v. Polarad Electronics Corp., *supra*, 287 F.2d at 494. LaCrosse and, even more, La Crosse are far closer to Cross than the accused marks in many cases where this court has ruled in favor of a plaintiff. See, *e. g.*, George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536, cert. denied, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 646 (1944), (Tangee v. Zande); La Touraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946), (La Touraine v. Lorraine). Addition of the

words "by Bradley" does not save the day; a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus "an aggravation, and not a justification." Menendez v. Holt, 128 U.S. 514, 521, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888); see also Jacobs v. Beecham, 221 U.S. 263, 272, 31 S.Ct. 555, 55 L.Ed. 729 (1911). This might even be so with respect to immediate purchasers from Bradley; certainly it could be true in the case of users. The last straw was the recent mailing, as bold an attempt at persuading purchasers that their donees would think they were receiving Cross pens as could be imagined. It should be known by this time that this court does not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product.

■ As indicated, the only affirmative defenses proffered were plaintiff's laches and its offer of what defendants were pleased to call a "naked license" to the well-known Fifth Avenue store, Mark Cross. On the former, the judge credited, as he permissibly could, the testimony of plaintiff's president that Cross had not been aware of defendants' references to La Crosse in their catalogues or at trade shows until the recent mailer came to its attention; this was buttressed by the plaintiff's record in pursuing trademark infringers on numerous other occasions. Since the court did not deal specifically with the Mark Cross incident, we must recount the facts.

■ When plaintiff discovered that Mark Cross was marketing a pen bearing the store's familiar name and/or logo, it promptly protested. The protest resulted in an agreement whereby Mark Cross would redesign its pen so as to remove any use of the word Cross or the Mark Cross logo on the pen itself. Mark Cross remained free to include the pen in advertisements carrying its name and

---

2. The game is generally spelled "lacrosse." We found nothing especially "masculine" in defendants' pen. And how "Crosset" came into the picture is unexplained.

logo and, apparently, to use these on the box in the same way that it did with other products. The record is insufficient to enable us to determine whether, from plaintiff's standpoint, this settlement was less than, more than, or exactly equal to that required by decisions on the vexing problem which occurs when two parties with identical surnames have long used these as marks. See, *e. g.*, Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 105 F.2d 908 (2 Cir.), cert. denied, 308 U.S. 616, 60 S.Ct. 262, 84 L.Ed. 515 (1939); S.C. Johnson & Son v. Johnson, 116 F.2d 427 (2 Cir. 1940); S.C. Johnson & Son v. Johnson, 175 F.2d 176 (2 Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); 3 Callmann, *supra,* § 85.2. However this may be, the showing of plaintiff's vigorous effort to limit intrusion by Mark Cross puts this case light years away from the Lanham Act's definition of abandonment, 15 U.S.C. § 1127 see also 3 Callmann, supra, § 79.

Affirmed.