**BANFF, LTD., f/k/a Sweater Bee by Banff, Ltd., Plaintiff,**

v.

**FEDERATED DEPARTMENT STORES, INC., and Bloomingdale's, a division of Federated Department Stores, Inc., Defendants.**

No. 86 Civ. 3635 (RWS).

United States District Court, S.D. New York.

June 5, 1986.

Dennis Grossman, New York City (Eileen King, of counsel), for plaintiff.

Kuhn, Muller & Bazerman, New York City (Steven H. Bazerman, Julius Rabinowitz, Frank D. Decolvenaere, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Banff, Ltd. ("Banff") brings this action under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), to enjoin defendant Bloomingdale's, a division of Federated Department Stores, Inc. ("Bloomingdale's"), from using a false designation of origin on women's wearing apparel and on May 16 sought a preliminary injunction against Bloomingdale's use of the mark "B Wear" in connection with the sale of women's apparel, claiming that it infringes on Banff's prior use of the trademark "Bee Wear." On the facts and conclusions set forth below, Banff's motion for a preliminary injunction is granted.

### Facts

Banff is a manufacturer and distributor of women's wearing apparel throughout the United States. Since 1971, Banff has employed the trademark "Bee Wear" in marketing a particular line of women's wearing apparel. During 1971 to 1982, Banff's wholly-owned subsidiary Bee Wear Sportswear, Ltd. marketed apparel under the "Bee Wear" trademark. Following a 1982 merger between Banff and Bee Wear Sportswear, Ltd. the "Bee Wear" mark has been marketed by a division of Banff.

During this 15-year period of marketing, Banff's aggregate net sales of "Bee Wear" apparel have exceeded $75 million, including more than $10 million during the most recent year. Banff continues to manufacture and market "Bee Wear" apparel and claims that net sales and open orders of the apparel for 1986 have increased 400% over the sales for 1985.

Banff sells "Bee Wear" apparel in each of the following states in which Bloomingdale's maintains its stores: Connecticut, Florida, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Texas and Virginia. Banff's net sales of Bee Wear apparel in these states for 1985 were almost $6.8 million or approximately 68% of Banff's nationwide sales for this apparel. In each local area in which Bloomingdale's maintains a store, Banff sells its apparel to competing large department stores including Lord & Taylor, Macy's, Abraham & Strauss, and John Wanamaker. Beginning in 1973 and continuing through at least 1983, Banff has also sold Bee Wear apparel to Bloomingdale's on several occasions.

Bloomingdale's is a leading department store which commenced its business in 1872. Since the 1930's, Bloomingdale's has used the letter B, by itself and in connection with the word Bloomingdale's or a generic description of goods, to promote both its general business and particular goods. For example, Bloomingdale's has used the B mark on its buildings and prominently displayed the B during renovation of its Manhattan store in 1948. The cosmetics and perfume departments on the first floor of the Manhattan store has been heavily advertised as "B Way" since 1979. The Bloomingdale's B has also been used to adorn shopping bags, boxes, and employee identification pins. Finally, Bloomingdale's has used the B mark in combination with particular product names such as bedding, furniture polish, soap and hosiery.

As early as August, 1982, Bloomingdale's had created a special department to sell junior women's wear which was called the B Wear Department. In some of Bloomingdale's stores, these departments displayed a B Wear sign to identify them within the store. The creation of Bloomingdale's new private label brand was first considered six months ago. The vice president of Bloomingdale's in charge of general merchandise has acknowledged that when selecting the "Bee Wear" brand for Bloomingdale's, she was aware of Banff's Bee Wear mark. Banff first discovered the use of B Wear on women's apparel in March, 1986 and until this litigation was unaware of the B Wear Departments at Bloomingdale's stores.

While the Bloomingdale's B mark has been employed extensively for more than fifty years, its use has been limited to two predominant styles. The first style, which at one time was patented, is a capital "B" which has a flowing romantic shape with three-dimensional shading. The other style which has lately become more prominent is a lower case "b" which is a modern design distinguished by its simplicity and is comprised of an unadorned loop and upstroke.

The creation of Bloomingdale's private brand of women's apparel bearing the "B

Wear" can be seen as yet another extension of the company's marketing based on its initial. To date, Bloomingdale's has sold approximately 87,000 units of this clothing at an average price per piece of $25.00. Presently, there are approximately 62,000 units of "B Wear" merchandise on display in Bloomingdale's chain of stores and an additional 65,000 units are on order, roughly $3 million of merchandise at retail prices, approximately one-third the volume of the sales of competing Banff products in 1985.

No surveys or other objective evidence of confusion were introduced by either party.

## Conclusions

The standards governing motions for preliminary injunctive relief in this circuit are well-settled. To obtain such relief, the plaintiff has the burden of establishing: (1) irreparable harm, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the moving party's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### A. Likelihood of Success

■ Section 43(a) of the Lanham Act proscribes the false designation of origin in the use of trademarks by providing that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of the origin or the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). Section 43(a) extends protection to both registered and unregistered trademarks. *See Union Mfg. Co. v. Han Baek Trading Co.*, 763 F.2d 42, 48 (2d Cir.1985); *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 212 n. 5 (2d Cir.1985). The misappropriation of a senior user's trademark constitutes a false designation of origin and is "the equivalent of ... trademark infringement." *Han Baek Trading Co., supra*, 763 F.2d at 48.

There is no dispute that Banff has continuously used the Bee Wear mark for a substantial period of time. Moreover, since the "Bee Wear" mark combines an arbitrary and generic term, the resulting arbitrary mark is entitled to copyright protection. *Cf. Thompson Medical Co., supra*, 753 F.2d at 212–13. Therefore, Banff is entitled to protect its mark against confusingly similar marks and the sole issue to consider with respect to Banff's likelihood of success in this action is whether Bloomingdale's mark is likely to cause confusion with that used by Banff. Likelihood of confusion is at the heart therefore of Banff's present claim. *See Standard & Poor's Corp. v. Commodity Exchange, Inc., supra*, 683 F.2d 704, 708 (2d Cir.1982).

While each trademark infringement use must be considered in the context of its own particular facts, an analysis of the likelihood of confusion must consider the factors laid out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Thus it is necessary to consider:

> [The] strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Id.* at 495.

### 1. Strength of the Bee Wear Mark

In evaluating the strength of a trademark, the court must consider "the distinc-tiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). The strength of the mark has frequently been characterized in accordance with the four categories—generic, descriptive, suggestive and arbitrary—and arbitrary marks are generally considered the strongest. Such a categorization is not, however, determinative, since the strength of the mark turns ultimately on the distinctiveness of the particular terms. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983).

In this case, while the "Bee Wear" mark combines arbitrary and generic elements to comprise either a suggestion or arbitrary mark, it is, nevertheless, a rather weak mark. Bloomingdale's has demonstrated the presence of a number of registered uses of the word "Bee" or the letter "B" in conjunction with other words constituting marks used in the apparel market. Moreover, the word "Bee," while it is not descriptive of the items of apparel, is neither a new or distinctive word in itself. Therefore, I conclude that Banff's mark is not a strong indicator of origin. *See generally Plus Products, supra*, 722 F.2d at 1005–06.

### 2. Similarity of the Marks

In weighing the similarity of the marks, the relevant test is not a direct comparison of similitude but rather an estimation of whether the labels create the "same overall impression" when viewed separately. *See Paco Rabanne Parfumes, S.A. v. Norco Enterprises, Inc.*, 680 F.2d 891, 893 (2d Cir.1982). When comparing "B Wear" with "Bee Wear," the similarities are so obvious and strong that one may quickly reach the conclusion that the marks create the same overall impression to consumers.

Also significant to this conclusion of strong similarity is the oral impression created by the combination of the two works

and the visual similarity of the labels. Despite the absence of two letters in Bloomingdale's mark, the overall impression is very similar. As explained in a similar context, "[t]he initial letters and the last syllables—probably the parts of any word which impress themselves most firmly upon the meaning—are identical. The similarity is, of course, most striking in oral speech." *La Touraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115, 117 (2d Cir.1946). *See also A.T. Cross Co. v. Jonathan Bradley Bros. Inc.*, 470 F.2d 689, 692 (2d Cir.1972) ("LaCrosse" held to be confusingly similar to "Cross" in pens and pencils").

Bloomingdale's asserts that the two marks are distinctive due to the fact Banff's mark conjurs an image of honeybees while the image created by their own new mark's use of the letter "B" is that of Bloomingdale's store itself. A comparison of the two labels does not, however, support this contention. While Banff has used a variety of type styles on its "Bee Wear" labels, each is a bold Roman or block letter design which in no way attempts to invoke the insect for which it is named. The Bloomingdale's label also adopts a strong Roman letter design which is more similar to Banff's "Bee Wear" label than to any other of various styles of "B" used by Bloomingdale's to market its own name. The similarity of typefaces must be considered as aggravating the similar impression generated by the two closely worded labels. *Cf. Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., v. Steinway & Sons*, 523 F.2d 1331, 1339 (2d Cir.1975).

The other notable difference between the labels is Bloomingdale's addition of its company name in small print below the "B Wear" mark. This addition of the suffix is in itself insufficient to offset the similarity between the two labels. In the first place, the Bloomingdale's name is listed in such small print as to lead to the conclusion that it is not the company name which Bloomingdale's is relying to sell these goods but rather the mark which is so similar to that previously used by the plaintiff. *See American Home Products, supra*, 589 F.2d at 106. Moreover, the use of a defendant's own name in conjunction with an otherwise similar mark does not generally excuse the infringement since it may instead simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark. *A.T. Cross Co., supra*, 470 F.2d at 692. *See American Home Products, supra*, 589 F.2d at 107; *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir.1970); *Miles Shoes, Inc. v. R.H. Macy & Co., Inc.*, 199 F.2d 602, 603 (2d Cir.1952). In the context of this case, the addition of the defendant's name to the contested mark should not derive to its benefit, since Bloomingdale's stores sell both its own private products and other manufacturers' products. Thus, the addition of its own name does not unambiguously mark that product as Bloomingdale's own since a consumer might also conclude that the name was added pursuant to a licensing agreement between Bloomingdale's and the outside manufacturer.

### 3. Proximity of the Products and Bridging the Gap

It is not disputed that the products on which the marks are used are competitive and that there is no gap to be bridged between the two lines of products. Bloomingdale's admits that the respective products are largely similar and from the evidence submitted it is apparent that each party is marketing moderately priced women's wearing apparel under their respective marks. Although this element alone is not dispositive, where there are overlapping goods, a weaker showing under the *Polaroid* factors will be sufficient to establish likelihood of confusion. *See Plus Products, supra*, 722 F.2d at 1008. The *Polaroid* factors were initially designed to evaluate non-competitive items and therefore the plaintiff's demonstration of the applicability of these factors will be magnified "where, as here, most of the products are competitive and therefore more susceptible to confusion." *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1100 (2d Cir.1969).

### 4. Quality of the Product

In accordance with their perception of the identity of the products, the parties also agree that their respective products are similar in quality. The significance of this finding is somewhat ambiguous, however. It has been stated that this factor is pertinent in order to protect a prior owner from the "risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1202 (S.D.N.Y. 1979), *aff'd*, 636 F.2d 1203 (2d Cir.1980). On the other hand, the Court of Appeals has commented that "the marked difference between the quality of plaintiff's and defendant's non-competing goods reduced rather than increased the likelihood of confusion." *Plus Products, supra*, 722 F.2d at 1006. Given this latter precedent, the similarity in the quality of the goods seems to underscore the identity of the party's respective products and therefore tends to increase the likelihood of confusion even though it does not tend to injure the reputation established by the plaintiff.

### 5. Sophistication of the Buyer

Given the care with which it might be expected that personal clothing would be selected, *see, e.g., Eli Lily and Co. v. Revlon, Inc.*, 577 F.Supp. 477, 485 (S.D.N.Y. 1983), and the significant stature of Bloomingdale's with the field of department store marketing, it seems appropriate to regard the buyers of the parties' products as relatively sophisticated. As this Circuit has cautioned, "[i]n some cases, of course, as when the products are identical and the marks are identical, the sophistication of the buyers cannot be relied on to prevent confusion." *McGregor-Doniger, supra*, 599 F.2d at 1137. This precautionary note is largely applicable here where the product lines are identical and the marks only slightly distinguishable.

### 6. Actual Confusion

There has been no demonstration by Banff of any actual confusion. While this failure to demonstrate actual confusion is detrimental to Banff's claim, it is not dispositive of the determination of likelihood of confusion. *See McGregor-Doniger, supra*, 599 F.2d at 1136. Since Bloomingdale's use of the mark has only been of short duration, the absence of proof on this element does not overshadow the other bases counseling in favor of Banff's claim. *Cf. Plus Products, supra*, 722 F.2d at 1006 ("no evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal").

### 7. Good Faith

Bloomingdale's admits that it had knowledge of Banff's "Bee Wear" mark at the time that it was developing its own mark, and evidence establishes that it had made several purchases of Banff's products over the past 10–15 years. From this, Banff contends that Bloomingdale's bad faith has been convincingly demonstrated. At the same time, however, it is evident that Bloomingdale's has marketed a number of products with the letter "B" as a prefix and therefore the decision to create a "B Wear" label may have grown naturally out of this tradition. *See, e.g., King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66, 69 (2d Cir.1972).

This issue, therefore, does not weigh unequivocally in favor of either party. One factor which slightly tips the balance in Banff's favor is the inference which may be drawn from the typescript of the label which resembles Banff's mark more than it does any of Bloomingdale's previous advertisements of its own initial in conjunction with private label goods.

### Weighing the Factors

Given the close similarity between the marks, the identical product lines and Bloomingdale's actual awareness of Banff's mark at the time it created its own, I conclude that Banff has demonstrated the likelihood of success on the merits of its section 43(a) claim. These factors are sufficient to establish a likelihood of confusion despite the relative weakness of Banff's "Bee Wear" mark.

## Irreparable Harm

In seeking a preliminary injunction on a Lanham Act claim, "a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." *Standard & Poor's Corp., supra,* 683 F.2d at 708. Banff has demonstrated the likelihood of confusion due to Bloomingdale's use of a similar mark on women's apparel. In this infringement case, threat of irreparable harm due to consumer confusion is particularly acute due to the identity of the products on which the marks are being employed on identical products and the great ability of Bloomingdale's to dilute the plaintiff's mark through its strong market position. As noted above, Banff competes with Bloomingdale's in each of its locations by selling women's apparel to other department stores.

Having demonstrated the likelihood of success on its claims and irreparable harm, Banff has satisfied the two elements which are the prerequisites for obtaining preliminary injunctive relief. On the other hand, Bloomingdale's asserts that, due to the damage it will suffer, an injunction is not appropriate. Bloomingdale's presently has approximately 130,000 units of clothing which contain the infringing label. Each label would have to be renamed and either sold without a label or else held off the shelves until they can be relabeled. Bloomingdale's contends that it would not be able to replace these labels in time to market these goods within the appropriate selling season. Banff, however, contends that the labels could be replaced within a matter of days. In any case, it is evident that Bloomingdale's sale of these garments will be considerably disrupted by any injunction. This showing fails to overcome Banff's right to injunctive relief, not because of the lack of harm to Bloomingdale's, but rather due to Bloomingdale's knowing decision to adopt a mark that was similar to that of Banff. As acknowledged by the officers of Bloomingdale's, the creation of the "B Wear" label followed Bloomingdale's purchases of "Bee Wear" goods and thus actual knowledge of that prior mark. There-fore, Bloomingdale's business decision to create and market a similar label does not now provide an equitable basis for opposing the grant of injunctive relief.

## Scope of the Injunction

Bloomingdale's will be enjoined from selling women's apparel under the current "B Wear" label pending the resolution of this action. Since Bloomingdale's has stated that it intends to change the print style used for the "B Wear" labels, it is necessary to consider the scope of the injunction.

Bloomingdale's proposes to introduce a new "B Wear" label which would use the lower case "b" commonly seen in Bloomingdale's advertising. With regard to the use of this type style, it is unlikely that Banff would prevail on its Lanham Act claim. Although such an alteration may seem insignificant, it would likely alter the outcome of a balancing of the *Polaroid* factors.

By using the lower case "b," Bloomingdale's would largely eliminate the visual similarity between the two marks. Moreover, given the numerous other uses of the lower case "b," it is possible that Bloomingdale's could establish this "b" as a protectible mark which is strongly associated with the company. If so, then it is unlikely that the use of this mark in conjunction with the generic term "wear" would infringe on Banff's use of the "Bee Wear" mark. Moreover, the fact that Bloomingdale's private label goods are sold only in its own stores would reduce the possibility of confusion since the lower case "b" label would be encountered only in the context of many other uses of that same symbol. Given the relative sophistication of department store customers, it seems unlikely that many would confuse the lower case "b" label with the mark used by Banff. Given these considerations, the injunction against the use of a "B Wear" label will not be extended to a label utilizing a "b" in the typescript featured in other Bloomingdale's advertising.

## Conclusion

For the reasons set forth above, Bloomingdale's will be preliminarily enjoined

from selling women's wear apparel under the current "B Wear" label which closely approximates the "Bee Wear" mark used by Banff. The parties are directed to submit a proposed order on notice within ten (10) days.

IT IS SO ORDERED.