**SAGE REALTY CORPORATION, Plaintiff,**

v.

**SAGE GROUP, INC., Defendant.**

**No. 89 Civ. 1939 (PKL).**

United States District Court,
S.D. New York.

April 21, 1989.

Shea & Gould, New York City (J. Joseph Bainton, William Dunnegan, Jonathan M. Landsman, of counsel), for plaintiff.

Weisberg & Berns, New York City (David E. Weisberg, of counsel), for defendant.

## ORDER & OPINION

LEISURE, District Judge:

Plaintiff Sage Realty Corporation ("Sage Realty") brought suit on March 21, 1989, against Sage Group, Inc. ("Sage Group"), for violation of the Lanham Act, 15 U.S.C. § 1125(a), New York State's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d, and an implied cause of action pursuant to N.Y. Bus.Corp.Law § 301(a)(2). A temporary restraining order and expedited discovery order was issued on March 21, 1989, by the Honorable Charles S. Haight, United States District Judge of this Court, sitting in Part I. At a hearing held on March 27, 1989, this Court vacated the temporary restraining order, granted expedited discovery for

defendant, and consolidated the preliminary injunction hearing with a hearing on the merits, pursuant to Fed.R.Civ.P. 65. Defendant answered and asserted a counterclaim for damages allegedly sustained by the granting of the temporary restraining order.

The action is now before this Court on plaintiff's motion for a preliminary and permanent injunction, pursuant to Fed.R.Civ. P. 65, to enjoin defendant from using in commerce the service marks "SAGE" and "SAGE GROUP, INC." Based upon the memoranda and supporting papers submitted to the Court, and testimony and exhibits presented at a proceeding before the Court on April 12, 1989, the following shall constitute the findings of fact and conclusions of law of this Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Plaintiff is a real estate management firm, incorporated in 1938. *See* PX 25. For over 50 years, plaintiff Sage Realty has been engaged in the business of managing buildings located principally in New York City. Since 1974, plaintiff has used the stylized logo "SAGE." *See, e.g.,* PX 26. This logo is used on Sage Realty's letterhead, business cards, *see* PX 12–18, advertisements, *see, e.g.,* PX 32, as well as when plaintiff attempts to rent commercial space. PX 28–31. Plaintiff asserts it has spent more than $500,000 promoting its business and that of the William Kaufman Organization, Ltd. ("Kaufman Organization") with the service marks "SAGE" and "SAGE REALTY CORPORATION."

Plaintiff Sage Realty only manages buildings that are owned by affiliates of the Kaufman Organization together with other investors, and that were constructed by affiliates of the Kaufman Organization. The Kaufman Organization itself is an affiliate of plaintiff.[1] Among the buildings managed by plaintiff, and owned in part by the Kaufman Organization are: 320 West

---

1. Sage Realty Corporation is wholly owned by Melvyn and Robert Kaufman, the sons of William Kaufman. Melvyn and Robert Kaufman

also own approximately 98 percent of the capital stock of the Kaufman Organization. Complaint ¶ 4.

13th Street, 210 East 49th Street, 777 Third Avenue, 437 Madison Avenue, 77 Water Street, 127 John Street, 747 Third Avenue, 5 Hanover, 767 Third Avenue, 209–211 East 48th Street and 17 State Street. Complaint ¶ 5.

Plaintiff's buildings, through its management, have gained significant recognition. For example, plaintiff has constructed on the roof of 77 Water Street a steel replica of a World War I Sopwith Camel fighter plane, complete with an astro turf runway, landing lights and a windsock, which was the subject of an article in the New York Times. PX 19. Additionally, at 777 Third Avenue, plaintiff has constructed an outdoor swing big enough to accommodate 20 people. This building was the subject of an article in the Real Estate Forum. PX 27. At 767 Third Avenue, plaintiff constructed the world's largest chessboard, which is three stories high with movable pieces 2½ feet in diameter, enabling the recreation of historical chess games. Complaint ¶ 3.

Plaintiff Sage Realty only manages buildings in which its affiliate, the Kaufman Organization, owns an equity interest. Plaintiff asserts that this policy was intended to create the impression among members of the real estate community that Kaufman Organization buildings would be managed with the utmost care. Sage Realty has worked to develop and maintain a reputation concerning the quality and integrity of the property it manages. Robert Kaufman ("Kaufman"), executive vice president of Sage Realty Corporation, testified that the success of plaintiff's efforts are demonstrated by the low turnover rate and high rerental rate of property managed by Sage Realty. Kaufman made a most favorable impression on the Court as a totally credible and reliable witness.

To demonstrate the care it takes in managing buildings and its concern over likely confusion with defendant's service mark and corporate name, Kaufman testified that plaintiff includes in all leases a provision requiring alterations in rented space be performed by contractors approved by Sage Realty. If a tenant does not use an approved contractor, Sage Realty imposes a supervision charge. This policy is aimed at maintaining the quality of the buildings managed by Sage Realty. However, in order to ensure good tenant relations, Sage Realty maintains no economic relationship with the approved subcontractors. Additionally, in order to maintain its reputation for quality, plaintiff has developed its own elevator maintenance company under the "sage" name. This company maintains all the elevators in the properties managed by Sage Realty within New York City.

Defendant Sage Group, is a New York corporation incorporated in August of 1987. Sage Group is in the business of construction and real estate development. It provides architectural design services, both interior and exterior, and general contracting services. Majed Khandji ("Khandji"), president and sole employee of Sage Group, testified that Sage Group is not, at the present time, in the business of managing buildings. However, a promotional pamphlet distributed by defendant contained a list of services offered, including "Property Management/Upgrade." PX 3. Moreover, defendant asserts that it is a growing, aggressive enterprise, and would not turn down any profitable business—including the management of a building—that was offered.

As of the present time, Sage Group has earned no profits. However, defendant has recently become the exclusive representative in the United States for Rochin International ("Rochin"), a British firm. Rochin is a an interior design and furnishing company, specializing in middle eastern designs. Khandji testified that a meeting was scheduled with Rochin, concerning a new project on March 25, 1989. Defendant cancelled this meeting due to Judge Haight's temporary restraining order served on March 21, 1989.

Defendant contends that the word "sage" was used in the name of Sage Group, Inc. because it denotes wisdom and expertise. Allegedly a prospective co-owner of the corporation, Tori Zorakhsh ("Zorakhsh"), suggested the name. Zorakhsh attended the Sage Graduate School at Cornell. At the time the name was chosen,

Khandji was the sole shareholder of the corporation. He testified that the choice of the name "Sage Group, Inc." was solely his and that at that time, he had never heard of Sage Realty Corporation.

Initially, Sage Group used the logo as shown on PX 5. This logo was used from incorporation until June, 1988. Around that time defendant employed a graphic designer, Fran Banieri, "to develop a new logo" for Sage Group. The logo was changed because Khandji wanted a more professional look. Khandji gave the designer a copy of the February 1988 Real Estate Forum to aid her in developing the new logo. The centerfold of this magazine featured 17 State Street, a building owned by plaintiff. Plaintiff's name, but not its logo, appeared therein. Defendant distributed written announcements and brochures containing its name and new logo, PX 10 & 11, to approximately one thousand real estate professionals, including leasing brokers, in the greater metropolitan area. *See* DX D.

Khandji testified that at the time defendant's new logo was created he had neither seen plaintiff's logo nor knew of plaintiff's existence. Khandji testified that he was not aware of Sage Realty until he received the 1989 Real Estate Diary, in the middle of December, 1988. In the Real Estate Diary, Sage Realty and Sage Group are listed *seriatim*. The Real Estate Diary is sent, yearly, to thousands of real estate professionals.

## CONCLUSIONS OF LAW

A. *The Lanham Act Claim*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in relevant part:
Any person who shall affix, apply, or annex, or use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is

likely to be damaged by the use of any such false description or representation.

The Act protects not only registered trademarks, but unregistered marks, such as "SAGE REALTY CORPORATION" and "SAGE." *See Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486 (2d Cir.1988); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 212 & n. 5 (2d Cir.1985).

■ To determine whether an unregistered mark has been infringed a two-step test is applied. First, a plaintiff must demonstrate that its mark merits protection. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976); *see also Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir.1987); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985). Trademarks are divided into four categories with respect to protection. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch, supra,* 537 F.2d at 9. A generic term is one which refers to the genus of which a particular product is a species. *Id.* For example, "aspirin" is a generic term. A descriptive mark "describes the qualities or characteristics of a good or service." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). A suggestive term is one which "requires imagination, thought and perception to reach a conclusion as to the nature of the [services]." *Abercrombie & Fitch, supra,* 537 F.2d at 11 (*quoting Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D. N.Y.1968)). For example, the trademark "Playboy" has been held to be suggestive with respect to the magazine title. *See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 566–67 (2d Cir.1982). Fanciful terms are "coined" terms, which have no independent meaning, while arbitrary terms have a meaning, but are not usually associated with a particular good or service. *See Abraham Zion, supra,* 761 F.2d at 104.

■ Before beginning analysis in the present case, the Court is fully cognizant that placing a mark in one of these four categories is far from an exact science, and that the differences between the classes, which is not always readily apparent, makes placing a mark in its proper context and attaching to it one of the four labels an equivocal undertaking at best. *See Banff, supra; 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 87 & n. 6 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). In the present case, plaintiff contends that its service mark "SAGE REALTY CORPORATION" and the "SAGE" logo are arbitrary marks. Defendant contends that the term "SAGE" is a descriptive mark, arguing that it denotes a real estate corporation conducting it business with wisdom, prudence, and good judgment. Although the term "sage" has a meaning, namely wise, it is one that is not usually associated with a particular service, such as a realty management company. Rather, the term "sage" is equally applicable to all fields of endeavor. The Court, therefore, finds that the mark "SAGE REALTY CORPORATION" and the "SAGE" logo are arbitrary or fanciful marks. Plaintiff's marks, being arbitrary, are entitled to trademark protection without proof of secondary meaning. *See 815 Tonawanda Street Corporation v. Fay's Drug Company*, 842 F.2d 643 (2d Cir. 1988); *Abraham Zion, supra*, 761 F.2d at 104. Accordingly, plaintiff is entitled to protect its mark against confusingly similar marks.

Consequently, the Court turns to the second step of the analysis which is whether defendant's marks are likely to cause confusion with those marks used by plaintiff. *See Banff, supra.* Likelihood of confusion is at the heart therefore of plaintiff's present claim. *See Standard & Poor's Corp. v. Commodity Exchange, Inc*, 683 F.2d 704, 708 (2d Cir.1982). While each trademark infringement use must be considered in the context of its own particular facts, an analysis of the likelihood of confusion must weigh the factors enunciated by Judge Friendly in *Polaroid Corp. v. Polar-ad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Thus it is necessary to consider:

> [The] strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Id.* at 495.

### 1. *Strength of the Mark*

■ The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods or services sold under the mark as emanating from a particular source. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir.1979). The strength of the mark has frequently been characterized in accordance with the four categories—generic, descriptive, suggestive and arbitrary—and arbitrary marks are generally considered the strongest. *See Banff, Ltd. v. Federated Dept. Stores, Inc.*, 638 F.Supp. 652 (S.D.N.Y.1986), *aff'd in relevant part*, 841 F.2d 486 (2d Cir. 1988). The Court notes that the determination of the strength of the mark is perhaps the most important factor in likelihood of confusion analysis because the weaker the mark, the less protection it is afforded.

In the present case, plaintiff has been in the real estate management business, using the name "SAGE REALTY CORPORATION" for the past 51 years. It has used the stylized "SAGE" logo since 1975. Plaintiff's service marks are arbitrary, distinct and therefore strong. In the present case, where the marks are so similar, plaintiff can carry its burden on the strength of the mark factor without a showing of secondary meaning. *See McGregor–Doniger, supra; Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Plaintiff has demonstrated that it has developed a strong busi-

ness reputation for quality management. In developing this reputation plaintiff has used its trade name, and more recently the "SAGE" logo. The Court therefore determines that the service marks "SAGE REALTY CORPORATION" and the "SAGE" logo are strong marks.[2]

### 2. *Actual Confusion*

■ A party is not required to adduce evidence of actual confusion in order to obtain injunctive relief. *See, e.g., Standard and Poor's Corp. v. Commodity Exchange,* 683 F.2d 704, 708 (2d Cir.1982). In the present case, there has been only a minimal showing by plaintiff of any actual confusion. Sandra Kerin ("Kerin"), a vice president of Sage Realty, received one of defendant's brochures in the mail, on March 10, 1989. *See* PX 2 & 24. Upon receipt, Kerin took the brochure to Melvyn Kaufman. On March 13, 1989, Kerin received a telephone call from Mary Fehrenbach ("Fehrenbach"), a member of the Women's Real Estate Group of New York. Fehrenbach had also received a mailing from Sage Group and telephoned Kerin to inquire as to whether Sage Realty had gone into the construction business. This is the only evidence of actual confusion offered by plaintiff.

Although plaintiff has only made a minimal showing of actual confusion this is not dispositive of the determination of likelihood of confusion. *See McGregor–Doniger, supra,* 599 F.2d at 1136. The absence of more proof is not especially significant in the present case, particularly given the short duration and scope of defendant's use of the service mark "SAGE" and "SAGE GROUP, INC," as well as the expedited discovery schedule. *Cf. Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983) (absence of instances of actual confusion over three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal).

### 3. *Similarities Between Services and Marks*

■ In weighing the similarity of the marks, the relevant test is not a direct comparison of similitude but rather an estimation of whether the labels create the "same overall impression," when viewed separately. *See Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.,* 680 F.2d 891, 893 (2d Cir.1982). It cannot be denied that there is a substantial similarity between the parties' trade names. In addition, when comparing the stylized "SAGE" logos used by each of the parties, the similarities are so obvious and strong that one may quickly reach the conclusion that the marks create the same overall impression to consumers.

Defendant has two logos which it currently employs. *See* PX 10 & 11. Both of defendant's logos consist of the stylized name "SAGE GROUP, INC.," with the name "SAGE" appearing as the predominate word. *See* PX 11. However, in one version of the logo two skyscrapers have been added to the upper left hand corner. *See* PX 10. Although the addition of the skyscrapers in some of defendant's logos decreases the similarity with plaintiff's, when considered in terms of their overall impression, *see McGregor–Doniger, supra,* 599 F.2d at 1133; *C.L.A.S.S. Promotions v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985), the similarity is not significantly reduced.

Moreover, the use of the company name in connection with the logo does not lessen the substantial similarity of the marks. In the first place, as stated above, the names themselves—"SAGE REALTY CORPORATION," and "SAGE GROUP, INC."—are substantially similar. The addition of the defendant's name, Sage Group, Inc., to the logo is insufficient to offset the similarity between the logos. The Court notes that the company name is listed in small print which leads to the conclusion that it is not the entire company name that is being re-

---

**2.** In the present case, defendant conceded in its earlier papers that plaintiff has strong service marks. *See* Defendant's Memorandum in Support of Motion to Vacate TRO at 8. However, subsequently, defendant contended that plaintiff has weak service marks. *See* Defendant's Pre-Trial Memorandum at 7.

lied on to sell the services but rather the mark, and term "sage," which is so similar to that used by plaintiff. *See American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir.1978). Moreover, the use of a defendant's own name in conjunction with an otherwise similar mark does not generally excuse the infringement since it may instead simply increase the misappropriation by linking the defendant's own name to the trademark. *See A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972); *American Home Products, supra*, 589 F.2d at 107; *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970); *Miles Shoes, Inc. v. R.H. Macy & Co.*, 199 F.2d 602, 603 (2d Cir.1952), *cert. denied*, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953).

The Court finds that the dissimilarities are insufficient to overcome the similarities of the service marks. The similarity in appearance between plaintiff's and defendant's marks cannot be denied, and this factor has a substantial impact on the likelihood of confusion.

### 4. *Proximity of the Marks*

Proximity is a closer question than similarity. The concern here is whether "it is likely that consumers mistakenly will assume [ ] that [the junior user's services] are associated with [the senior user]." *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir.1986). Plaintiff contends that the parties are in "essentially the same business—that of providing real estate services in respect of commercial buildings." Memorandum of Law in Support of Plaintiff's Request for a Temporary Restraining Order at 8–9. Defendant, however, contends that the parties are involved in very different services. Defendant is in the business of construction and real estate development. Plaintiff is in the business of managing buildings, located primarily in New York City, that are owned by affiliates of the Kaufman Organization together with other investors and which buildings were constructed by affiliates of the Kaufman Organization. Complaint ¶ 4. Plaintiff contends that defendant's contin-

ued use of the "SAGE" logo and the name "SAGE GROUP, INC." will create a likelihood of confusion among members of the public in general and the real estate community in particular, including tenants seeking to lease office space, brokers soliciting listings from owners of commercial buildings and plaintiff's partners and lenders. Moreover, defendant has candidly indicated a willingness to enter the real estate management industry.

Although the parties are not now engaged in the identical business, there is a close proximity of the service marks in issue. Both parties deal with the same group of consumers and are involved in the same market—the real estate market. The proximity of the marks is demonstrated by the fact that both companies are listed in the New York Real Estate Diary. Moreover, although Khandji testified that Sage Group is not currently in the business of property management, it does at least solicit such business, *see* PX 3, and has indicated a willingness to expand into the management field. The Court therefore finds that the proximity of the service marks in the present case weigh in plaintiff's favor.

### 5. *Sophistication of the Buyer*

The touchstone for determining the level of sophistication of the relevant purchaser is:

> The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods [or services] ...

*McGregor–Doniger, supra*, 599 F.2d at 1137. In the instant case, both parties deal with a sophisticated group of consumers. Although sophistication of consumers usually militates against a finding of a likelihood of confusion, *see, e.g., Plus Products, supra*, 722 F.2d at 1007, it might on occasion increase the likelihood of confusion, depending upon the circumstances of the market and the services. *See Centaur Communications v. A/S/M Communica-*

*tions Inc.,* 830 F.2d 1217, 1228 (2d Cir. 1987).

Defendant argues that this sophistication prevents these consumers from becoming confused by nearly identical logos and company names. On the contrary, it is the sophisticated real estate owner, lender or tenant who is most likely to assume that the presence of the "SAGE" name and logo indicates some sort of association between the two companies. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1341–42 (2d Cir.1975) (buyers of quality piano, being sophisticated, are more likely mistakenly to associate piano manufacturers using similar trade names).

#### 6. *Defendant's Intent*

Evidence of intentional copying creates a presumption that defendant succeeded in creating a "confusing similarity of appearance." *Warner Bros. v. American Broadcasting Companies,* 720 F.2d 231, 247 (2d Cir.1983). In the present case, the name "SAGE GROUP, INC." was chosen in August of 1987 and there was no direct evidence presented that Khandji knew of Sage Realty at that time. Rather, it is defendant's position that the name was chosen because of a prospective co-owner's connection with the Sage Graduate School at Cornell University. Under these circumstances, the Court finds no bad faith in Sage Group's change in logos in June, 1988. Khandji testified credibly at the proceedings herein that he, as sole shareholder and president of Sage Group, made the determination to change logos in order to portray a more professional appearance and did not know of Sage Realty at that time. Moreover, although a copy of the February, 1988 Real Estate Forum was sent to the graphic designer, plaintiff's logo was not contained therein. The Court finds that defendant Sage Group, Inc., was not acting in bad faith in adopting either its trade name or logo.

#### Weighing the Factors

In sum, given the strength of plaintiff's marks and the close similarity and proximity of the marks plaintiff has demonstrated a likelihood of confusion under Section 43(a). Accordingly, as plaintiff has demonstrated both that its service marks warrant protection and a likelihood of consumer confusion, the request for a preliminary and permanent injunction is hereby granted.

### B. *Plaintiff's State Law Claims*

Plaintiff also asserts claims under New York State's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d, and an implied cause of action pursuant to N.Y.Bus. Corp.Law § 301(a)(2).

#### 1. *Section 368–d: Anti–Dilution Statute*

New York General Business Law § 368–d provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

Section 368–d extends the protection afforded trademarks and trade names beyond that provided by actions for infringement under the Lanham Act or N.Y.Gen. Bus.Law § 368–b. "The evil which the Legislature sought to remedy [by enacting § 368–d] was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name." *Allied Maintenance v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Thus, under this statute, it would be of no significance whether the parties were in competition, *see Lesportsac Inc. v. K Mart Corp.,* 617 F.Supp. 316 (E.D.N.Y.1985), nor whether there was

likelihood of consumer confusion. *See Universal City Studios, Inc. v. Nintendo Co,* 746 F.2d 112 (2d Cir.1984), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Rather, plaintiff must demonstrate either that there is likelihood of injury to business reputation or dilution of distinctive quality of mark or trade name. *Little India Stores, Inc. v. Singh,* 101 A.D.2d 727, 475 N.Y.S.2d 38 (1st Dep't 1984). To obtain an injunction, a § 368–d plaintiff must demonstrate (1) that his mark either (a) is distinctive or (b) has acquired a secondary meaning; (2) that there is a likelihood of dilution, which may be proved using either a "tarnishing" or a "blurring" theory; and (3) predatory intent. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625–26 (2d Cir.1983); *P.F. Cosmetique, S.A. v. Minnetonka, Inc.,* 605 F.Supp. 662, 672 (S.D.N.Y.1985); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1206–09 (E.D.N.Y.1983).

Plaintiff contends that its mark is distinctive. Although this Court has previously determined that plaintiff's trade name and logo are arbitrary and that plaintiff has a strong mark, this determination was made applying federal trademark law. Federal trademark infringement standards relating to strength of mark were not established with the concerns of the New York anti-dilution statute in mind. *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1985). Therefore, the Court must determine the distinctiveness of plaintiff's service marks under § 368–d.

 To call a mark distinctive is to imply that it is the product of arbitrariness or fancy. Distinctive means unique; it is the opposite of "descriptive" or "generic." *See Allied Maintenance, supra,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162; *Loctite Corp. v. National Starch & Chemical Corp.,* 516 F.Supp. 190, 218 (S.D.N.Y. 1981). However, only the strongest, most well-established marks are protected by § 368–d against dilution, *see Sally Gee, Inc., supra,* 699 F.2d at 625 (listing as examples of diluting trade names: "Dupont shoes, Buick aspirin, Schlitz varnish, Kodak Pianos [and] Bulova gowns"), perhaps not even all those that qualify as arbitrary or fanciful. *See id.; Allied Maintenance,* 42 N.Y.2d at 548, 399 N.Y.S.2d 628, 369 N.E. 2d 1162 (Cooke, J., dissenting) (reading majority opinion to limit protection of statute to "most well known names").

 In considering the *Allied* standard, the Court finds that plaintiff's marks are not sufficiently distinct to warrant protection under the anti-dilution statute. The term "sage" is a common word in English usage. There is nothing in the name "SAGE REALTY CORPORATION" or the "SAGE" logo which indicates it is an inherently strong mark susceptible to dilution. *See Allied Maintenance, supra,* 42 N.Y.2d at 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162 ("Allied Maintenance" weak trade name).

 Nor has plaintiff demonstrated that its marks have secondary meaning and are therefore entitled to protection under the anti-dilution statute. A trademark has attained "secondary meaning" when the *purchasing public* associates that [trademark] with a single producer or source rather than just with the product itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). "The most important indicia of secondary meaning are advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Motown Productions, Inc. v. Cacomm, Inc.,* 668 F.Supp. 285, 289 (S.D.N.Y.1987), *rev'd on other grounds,* 849 F.2d 781 (2d Cir.1988); *see also Centaur Communications, supra,* 830 F.2d at 1222; *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985).

In order to demonstrate secondary meaning, plaintiff submits it has spent a cumulative total of $500,000 in promoting its business. These expenditures include various advertisements, *see, e.g.,* PX 28—32, as well as informational videotapes. *See, e.g.,* PX 40—41. Additionally, plaintiff has submitted some evidence of unsolicited media coverage. *See* PX 19, 27 & 42.

The Court finds that, for the purposes of this action, plaintiff has not brought forward sufficient evidence to demonstrated secondary meaning in either the "SAGE" logo or the name "SAGE REALTY CORPORATION." At the outset, the Court notes that the specific examples of media coverage submitted by plaintiff do not support a finding of secondary meaning. The article on the building at 17 State Street focuses on Robert and Melvyn Kaufman, and the Kaufman Organization. Although, it addresses a building managed by plaintiff, neither plaintiff's name nor logo appears therein. *See* PX 19. The same is true for the 1967 article in Real Estate Forum Magazine. *See* PX 27. Nor does the bulk submission of a Nexus search, containing publicity Sage Realty has received, aid in a finding of secondary meaning.

▆ The sole evidence in support of secondary meaning is advertising expenditures. However, mere advertising alone is insufficient to sustain a finding of secondary meaning. *See, e.g., Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir.1980); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979); *P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F.Supp. 662 (S.D.N.Y.1985). A mere showing of advertising does not provide a basis for determining the extent of customer awareness of a mark. *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1974) (no secondary meaning despite four (4) million dollars in promotion and the fact the plaintiff's product became the biggest seller in the market). The evidence here of attempts to popularize the plaintiff's marks are not conclusive. Promotion figures tell the Court little about the degree to which the public associates its service marks with a certain source. Plaintiff has failed to demonstrate that its service marks had secondary meaning identifying the services source because of which consumers would be moved to purchase. *See Ives Laboratories, Inc. v. Darby Drug Co.*, 455 F.Supp. 939 (E.D.N.Y.), *aff'd*, 601 F.2d 631 (2d Cir. 1978).

▆ As the Court has determined that plaintiff's service marks are not entitled to protection under § 368–d, it need not reach the issue of whether plaintiff has shown a likelihood of dilution. However, the Court notes that the absence of predatory intent by the junior user is a relevant factor in assessing a claim under the anti-dilution statute, *see Information Clearinghouse, Inc. v. Find Magazine*, 492 F.Supp. 147, 162 n. 44 (S.D.N.Y.1980), since relief under the statute is of equitable origin. *See Cue Publishing Co. v. Colgate–Palmolive Co.*, 23 A.D.2d 829, 259 N.Y.S.2d 377 (1st Dep't 1965). The Court's finding that the defendant acted in good faith in the present instance is an alternative ground for denying plaintiff relief under § 368–d.

2. *Section 301(a)(2)*

Additionally, plaintiff asserts a cause of action under § 301(a)(2) of the New York Business Corporation Law. This section provides:

> The name of a domestic or foreign corporation ... [s]hall not be the same as the name of a corporation of any type or kind ... or a name so similar to any such name as to tend to confuse or deceive.

Plaintiff asserts that an implied cause of action exists under this statute and the common law. In support of this theory, plaintiff cites *Chas. S. Higgins Co. v. Higgins Soap Co.*, 144 N.Y. 462, 39 N.E. 490 (1895).

As the Court has granted plaintiff the relief requested under the Lanham Act, 15 U.S.C. § 1125(a), it need not determine whether plaintiff has established a state cause of action beyond the numerous rights in trade names and trademarks codified in Article 24 of the New York General Business Law. *See Allied Maintenance, supra* (anti-dilution statute is essentially a codification of common law).

CONCLUSION

Plaintiff's claim for a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1125(a), is hereby granted. Defendant's counterclaim is denied.

IT IS HEREBY ORDERED that defendant, its principals, agents, servants, employees, successors and assigns, and all those acting in concert or participation with them, are permanently enjoined from:

(a) using in commerce the service mark "SAGE";

(b) using in commerce the service mark "SAGE GROUP, INC.";

(c) using in commerce any other mark, or corporate name in violation of plaintiff's rights under 15 U.S.C. § 1125(a);

(d) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (c) above.

SO ORDERED.