**HOME SHOPPING CLUB, INC., Plaintiff,**

v.

**CHARLES OF THE RITZ GROUP, INC., Defendants.**

No. 92 Civ. 8173 (CSH).

United States District Court, S.D. New York.

May 7, 1993.

Kenyon & Kenyon (Edward T. Colbert, Andrea Schedt, Suzanne Parker, of counsel), Washington, DC, for plaintiff.

Fish & Neave (Herbert F. Schwartz, Vincent N. Palladino, Evan M. Gsell, of counsel), New York City, for defendant.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (Gregory G. Jones, of counsel), Tampa, FL, for defendant.

HAIGHT, District Judge:

Plaintiff Home Shopping Club, Inc., ("HSC") commenced this Lanham Act suit against defendant Charles of the Ritz Group, Ltd., ("CORGL") in the United States District Court for the Middle District of Florida. HSC alleged causes of action for federal trademark infringement under 15 U.S.C. § 1114; use of a false designation of origin under 15 U.S.C. § 1125(a); and, under principles of pendent jurisdiction, causes of action based upon the common law and statutes of the State of Florida. HSC sought injunctive relief and money damages.

CORGL interposed an answer and then an amended answer, denying liability and objecting to the venue. HSC moved for a preliminary injunction, but before the district judge in Florida reached the merits of that motion, he transferred the action to this Court.

Thereafter discovery was completed. Counsel for the parties were directed to submit designated portions of the depositions

and exhibits upon which they would rely at oral argument, which took place on February 11, 1993. Counsel argued the cause on that date, plaintiff seeking a preliminary injunction and defendant opposing that application. This opinion resolves plaintiff HSC's motion for preliminary injunctive relief.

## Background

HSC is a Delaware corporation with its principal place of business in St. Petersburg, Florida. HSC is a self-described national marketer of consumer goods through "interactive retail television," telephone marketing, and national catalogue, telephone and mail order sales.

Among other goods, HSC sells a wide variety of cosmetic products to customers in every state of the Union. For purposes of the definitions contained in 15 U.S.C. § 1127, HSC is a related company to and under common ownership with Home Shopping Network, Inc.; HSC Cosmetics, Inc.; HSC Lifeway Products, Inc.; and HSC Mail Order, Inc., all Florida corporations.

While HSC markets its products in various ways, its primary effort takes place on television. Television viewers who subscribe to a cable television service may obtain, as part of their cable package, the Home Shopping Club Channel. To purchase products advertised on the HSC channel, a consumer must become a member of the Home Shopping Club, but the criteria for membership are not onerous. A club member places an order by telephoning the number displayed on the television screen while the particular product is being touted by one or more members of the HSC sales staff, referred to on the program as "hosts."

On August 5, 1986, Lindow, Ltd., a Connecticut corporation, obtained United States Registration No. 1,403,688 from the United States Patent and Trademark Office for the trademark ESSENCE OF TIME. The ESSENCE OF TIME trademark is described in the registration as being for "cosmetics, namely, skin emollient, in Class 3 (U.S.C. 51)." It is undisputed that in 1991 HSC acquired by assignment from Lindow all rights to the ESSENCE OF TIME trademark and federal registration thereof, as well as the good will associated therewith.

ESSENCE OF TIME skin cream is sold in a 2-ounce jar. It is a light brown color, although that color disappears when the cream is applied to the skin and rubbed into it. According to HSC's televised presentations, the cream is brown because it contains peat, a substance which is said to hold moisture and consequently makes the skin cream a good moisturizer, thereby retarding or preventing the outward manifestations of age. The HSC "hosts" advise the television audience, usually in breathless tones, of the stranger-than-fiction but nonetheless true circumstances giving rise to the cream. Some years ago in England the body of a man was found in what the HSC presentations refer as the "Lindow Moss Peat Bog." At first it was thought that the man was a recent murder victim, but scientific tests demonstrated that he had died 2,500 years ago. His fingernails, skin and hair were remarkably well preserved for a specimen so ancient; and it is claimed that the man was preserved by the peat in the bog. Some entrepreneur, presumably the incorporator of Lindow, Ltd., decided to add what the television presentations refer to as "unblemished Lindow peat moss" to skin cream and market the cream on the theory, in substance, that if the peat could preserve the Lindow Moss Peat Bog Man for 2,500 years, think what it can do for you.

While the HSC television presentations claim that men also find ESSENCE OF TIME beneficial, the product's primary market is women who watch television and have reached that level of maturity when they begin to be concerned by the appearance of aging. HSC markets a number of products under the trademark ESSENCE OF TIME. There is the skin cream which has been described thus far. It is referred to in HSC printed advertisements as a "Night Creme" [sic] and is described as follows:

Proven effective in helping skin maintain a nourished, radiant glow. Smooth on at bedtime and feel the softness and smoothness of your skin after just one application.

The substance of these claims and instructions are reiterated in the television presen-

tations. HSC also markets under the ESSENCE OF TIME trade name a "Daytime Liquid Moisturizer," an "Exfoliating Scrub," a "Facial Masque," and a "Body Cream Moisturizer."

HSC marketed the ESSENCE OF TIME skin cream and other products bearing that name at least from November 1991, throughout all of 1992, and continues to market them today.

CORGL is a Delaware corporation with its principal place of business in New York City. The company and its predecessors have since at least 1940 used .the trademark Charles of the Ritz in connection with a line of cosmetics products, including skin care products. In the fall of 1991, the Charles of the Ritz skin care line was comprised of about sixteen products. The company also marketed a separate CHARLES OF THE RITZ REVENESCENCE line of about thirteen skin care products.

In 1991, executives of defendant CORGL began to consider restoring its long-established cosmetic line to its more traditional marketing positioning, following a relatively brief time when the line was being directed to younger customers at lower prices. CORGL decided to once again market more expensive products through department stores, where floor displays could be mounted and beauty advisors be available to consult with customers. One of the chains of department stores CORGL dealt with was J.C. Penney. In a Penney intra-company bulletin, a sales executive advised all 440 Penney stores that on June 5, 1992, Penney would institute a national and local television campaign for Charles of the Ritz products, and place them on sale in all Penney stores. CORGL also markets its products through other department stores and certain independent drug stores.

One of the products which CORGL began to market in June 1992 is a skin cream called TIMELESS ESSENCE. TIMELESS ESSENCE is described as a "Night Recovery Cream." TIMELESS ESSENCE is a white skin cream sold in a box containing a glass jar which holds 1.7 ounces of cream. One of the box panels contains printed material which says in part:

For the first time, Charles of the Ritz introduces an exclusive cream that gives your skin a second chance. A second chance to act, feel, and look younger— virtually free of visible fine dry lines. Firmer looking. More vibrant, beautifully alive.

What makes TIMELESS ESSENCE so effective is MPG Compound (Methoxypropyl Gluconamide), a new patented molecule that penetrates within the upper epidermal layer to minimize cell build-up, allowing younger cells to travel through the layers of the epidermis to rise to the surface.

At about this time CORGL ran television and magazine advertisements in which the benefits of TIMELESS ESSENCE were touted by a well-known entertainment personality, Kathie Lee Gifford.

When HSC learned of this CORGL product, it claimed trademark infringement and sent CORGL a cease and desist letter, which the latter disregarded. This action followed.

## DISCUSSION

The central issue in a trademark infringement case is whether the junior user's use of the name gives rise to the likelihood of confusion among consumers of the junior user's goods or services.

In the case at bar, CORGL is the junior user of a name for skin cream which couples use of the word "Essence" with a temporal reference.

Likelihood of confusion is the particular target of the governing federal statute, the Lanham Trade–Mark Act, 15 U.S.C. § 1051 *et seq.*, which "protects against false designation of origin and false description or representation." *Thompson Medical Company, Inc. v. Pfizer, Inc.*, 753 F.2d 208, 212 (2d Cir.1985) (footnote omitted).

CORGL does not suggest that the trademark ESSENCE OF TIME that Lindow, Ltd. obtained for its skin cream in 1986 is not a valid one, or that HSC is not entitled, as Lindow's assignee, to protect and enforce that trademark.

Given a valid trademark, the critical issue in an action for trademark infringement "is whether there is any likelihood that an appreciable number of reasonable consumers would be misled or simply confused as to the source of the goods in question." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir.1985).

That is the central inquiry in alleged violations of both sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), (1988), which prohibit trademark infringement and false designation of origin, respectively. Referring to both sections of the statute, the Second Circuit has said recently: "The key issue in these types of trademark cases is whether an appreciable number of consumers are likely to be misled or confused about the source of the product in question." *Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993) (*citing Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 579–80 (2d Cir.1991)). The Second Circuit went on to say in *Nikon:*

> It is well settled that in cases involving a claim under the Lanham Act the trier of fact must consider and balance the factors set forth in *Polaroid Corp. v. Polorad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) to determine the "likelihood of confusion." The *Polaroid* test examines eight factors, including the strength of the senior user's mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the senior user will bridge the gap between the products, the sophistication of buyers, quality of defendant's product, actual confusion, and the defendant's bad faith in adopting the mark. *Polaroid, supra*, 287 F.2d at 495. This list, however, is not exhaustive, nor is any one factor determinative. Each factor must be balanced with the others to determine the likelihood of confusion. *Lang, supra*, 949 F.2d at 580.

*Id.*

I will consider the eight *Polaroid* factors in turn.

*(1) Strength of HSC's Mark*

To gauge the inherent distinctiveness of a mark, courts have used four categories: generic, descriptive, suggestive, and arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976) (Friendly, J.). The Second Circuit recently summarized these categories in *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993):

> A generic mark is generally a common description of goods and is ineligible for trademark protection.... A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. *McGregor–Doniger Inc. [v. Drizzle, Inc.]*, 599 F.2d [1126] at 1131 [ (2d Cir.1979) ]. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought and perception to reach a conclusion as to the nature of goods ..." *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985) (quoting *Stix Prods., Inc. v. United Merchants & Mfgrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1986)). Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement." *Abercrombie & Fitch Co.*, 537 F.2d at 11.

Judge Friendly considered the distinctions between suggestive terms on the one hand and fanciful or arbitrary terms on the other in *Abercrombie & Fitch*, at 537 F.2d 11 n. 12:

> As terms of art, the distinctions between suggestive terms and fanciful or arbitrary terms may seem needlessly artificial. Of course, a common word may be used in a fanciful sense; indeed one might say that only a common word can be so used, since a coined word cannot first be put to a bizarre use. Nevertheless, the term "fanciful", as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called "arbitrary."

"Although a suggestive mark is entitled to registration without evidence of secondary meaning, suggestiveness is not necessarily

dispositive of the issue of the strength of the mark." *Lang, supra* at 949 F.2d 581. Expanding further on that concept, the Second Circuit said in *Gillette* at 572:

> In evaluating a mark's strength, a court is permitted to consider the mark's secondary meaning, that is, the extent to which the public has come to identify the mark with a particular product. *Id.; McGregor-Doniger,* 599 F.2d at 1132. However, lack of secondary meaning does not preclude a court from finding that an otherwise distinctive mark is strong. *Id.* at 1132. *Cf. Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992) (inherently distinctive trade dress may be protected from its inception).

In the case at bar, the trademark ESSENCE OF TIME for a skin cream is not so inherently distinct or unusual as to be fanciful or arbitrary; nor does it sufficiently evoke the characteristics of the product to be descriptive. The mark is accordingly suggestive, and was entitled to the registration which it received without proof of secondary meaning.

I think that this particular trademark for a skin cream is only moderately strong. According to DX 150, during the period November 19, 1991 through November 19, 1992 HSC shipped only 112,068 units of ESSENCE OF TIME skin cream, of which 3,132 were returned. These seem to me rather modest sales for a nation-wide marketing effort.

Furthermore, I note from previous cases in this field that the word ESSENCE frequently appears in registered trademarks, for a wide variety of goods. *See Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 548 (S.D.N.Y.1991) and cases cited.

In *Gillette* the Second Circuit held that evidence of modest sales and extensive third-party use of one or more of the key words[1] supported a finding that the trademark in question had only moderate strength, deserving of trademark protection, but not entitled to the fullest protection available under the law. 984 F.2d at 573.

I reach that conclusion with respect to HSC's trademark ESSENCE OF TIME for its skin cream.

### (2) Similarity Between the Marks

The HSC mark is displayed primarily on the television programs by which HSC products are marketed. In a typical television offering, the phrase ESSENCE OF TIME SKIN CREME appears at the top of the picture. An open jar of the cream takes up the middle part of the picture; from time to time disembodied hands are observed dipping into the cream and rubbing it into the skin of the hands and wrists. To the left of the screen and in smaller letters, the distinctive HSC logo appears: those three letters set in the stylized rendition of a house or "home."

CORGL markets its TIMELESS ESSENCE skin cream in a silver box with a black border. The box contains on one panel the words TIMELESS ESSENCE, printed in block capital letters. Directly below those two words, the phrase "Night Recovery Cream" appears, also in block capitals but of smaller size lettering. There is then a space, followed by the phrase in script and with initial capital letters only: "Charles of the Ritz." Along the black border of the box, on that same panel, the words "Charles of the Ritz" appear in block capital letters.

ESSENCE OF TIME and TIMELESS ESSENCE are obviously similar names. They share the same two basic concepts: "Essence" and "Time." The grammatical structure is somewhat different: in ESSENCE OF TIME, two nouns are in juxtaposition to each other, while in TIMELESS

---

1. Third-party use of a key word dilutes the strength of the work. That is so, even though there is no apparent third-party use of the two key words together. In *Gillette* the district court, dealing with the trademark SPORTSTICK for a skin balm, pointed to "extensive third party use of the individual words 'sport' and 'stick' on personal care products, including over sixty uses of the word 'sport', although only plaintiff uses the mark SPORTSTICK." 808 F.Supp. 1013 at 1023. The Second Circuit, affirming a judgment in defendant's favor, said: "Moreover, extensive third party use of the words sport and stick 'weighs' against a finding that [WWW]'s trade name is strong." 984 F.2d at 573 (citing and quoting *Lang* at 949 F.2d 581).

ESSENCE the word "TIMELESS" is an adjective modifying the noun "ESSENCE." As HSC points out, each phrase contains four syllables; but a prosodist would also observe that the metrical feet are different. ESSENCE OF TIME consists of a dactyl followed by one accented syllable; TIMELESS ESSENCE consists of two trochees. But the effect of these differences is more than overcome by the appearance of the word "cream" (or "creme") in close proximity to the trade names. Thus HSC's ESSENCE OF TIME name, as it appears on television, is immediately followed by the phrase "SKIN CREME"; CORGL's trade name TIMELESS ESSENCE, both on the package and the jar, is immediately followed by the phrase "NIGHT RECOVERY CREAM."

If these particular phrases formed the boundaries of the entire controversy, it is apparent that similarity of the marks would be a factor weighing heavily in favor of HSC as plaintiff. But CORGL stresses that the TIMELESS ESSENCE box and jar also contain the trade name Charles of the Ritz, which has been in use for many years; and, it is fair to say, that trade name appears more prominently on the box than on the jar. That is important because presumably the box is what the consumer sees displayed at stores, at least part of the time (there is no evidence on the point). CORGL argues that its TIMELESS ESSENCE trademark is used as a "secondary" trademark to identify a Charles of the Ritz product, and that consumers of Charles of the Ritz products would make that assumption.

HSC responds that defendant's addition of the "Charles of the Ritz" name to the TIMELESS ESSENCE package, far from preventing actual confusion or excusing infringement. of the ESSENCE OF TIME name, only "exacerbates the problems experienced by HSC in the market by adding an element of misassociation of CORGL with HSC," HSC proposed conclusions of law at ¶ 15, citing for that proposition *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 638 F.Supp. 652 (S.D.N.Y.1986) *aff'd in part, rev'd in part,* 841 F.2d 486, 492 (2d Cir.1988).

Each case turns on its own circumstances, and there are circumstances in *Banff* which

arguably support CORGL rather than HSC. The plaintiff in *Banff* was a manufacturer and distributor of women's wearing apparel sold under the trademark "Bee Wear." During 15 years of marketing, the plaintiff's aggregate net sales of "Bee Wear" apparel exceeded $75 million, including more than $10 million during the most recent year prior to the litigation. Banff sued Bloomingdale's, the well-known department store, for creating and selling a private line of junior women's wear which was labeled "B Wear." Bloomingdale's defended on the ground, among others, that it placed its company name below the "B Wear" mark. Judge Sweet rejected that defense in an analysis which it is useful to quote:

> This addition of the suffix is in itself insufficient to offset the similarity between the two labels. In the first place, the Bloomingdale's name is listed in such small print as to lead to the conclusion that it is not the company name which Bloomingdale's is relying to sell these goods but rather the mark which is so similar to that previously used by plaintiff. *See American Home Products [v. Johnson Chemical Co., Inc.], supra,* 589 F.2d [103] at 106 [ (2d Cir. 1978) ]. Moreover, the use of a defendant's own name in conjunction with an otherwise similar mark does not generally excuse the infringement since it may instead simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark. *A.T. Cross Co. [v. Jonathan Bradley Pens, Inc.], supra,* 470 F.2d [689] at 692 [ (2d Cir.1972) ]. *See American Home Products, supra* 589 F.2d at 107; *W.E. Bassett Co. v. Revlon, Inc.* 435 F.2d 656, 662 (2d Cir.1970); *Miles Shoes, Inc. v. R.H. Macy & Co., Inc.,* 199 F.2d 602, 603 (2d Cir.1952). In the context of this case, the addition of the defendant's name to the contested mark should not derive to its benefit, since Bloomingdale's stores sell both its own private products and other manufacturers' products. Thus, the addition of its own name does not unambiguously mark that product as Bloomingdale's own since a consumer might also conclude that the name was added pursuant to a

licensing agreement between Bloomingdale's and the outside manufacturer.

638 F.Supp. at 656.

In the case at bar, the "Charles of the Ritz" name appearing on the box and on the jar of the TIMELESS ESSENCE skin cream is printed in letters equal in size or larger than the name TIMELESS ESSENCE: at least, that is so with respect to the box, which presumably first attracts the eye of many consumers. Secondly, there is no proof in the present record that CORGL, like Bloomingdale's, sells other manufacturer's products as well as its own, giving rise to the possible false impression that CORGL was selling TIMELESS ESSENCE skin cream under a licensing agreement with HSC.

■ Given the length of time that CORGL has been using the trade name Charles of the Ritz for cosmetics, including skin creams, and the relatively recent arrival and limited commercial success of HSC's ESSENCE OF TIME skin cream, I think there is some force to CORGL's contention that some consumers might regard the Charles of the Ritz mark as primary and TIMELESS ESSENCE secondary. That possibility reduces, but in my judgment does not eliminate, the effect of similarity of the marks as a factor favoring HSC on this motion for a preliminary injunction. As the Second Circuit said in *Banff*, 841 F.2d at 492, the test for determining the similarity of the marks factor "is whether the labels create the 'same overall impression' when viewed separately" (citing *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir. 1982)) (quoting *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979)). Notwithstanding the presence of the Charles of the Ritz mark in its packaging, I think that the close similarities between the ESSENCE OF TIME and TIMELESS ESSENCE marks, both in juxtapositions to references to creams, create the same overall impression when viewed separately.

*(3) Proximity of the Products*

■ I now consider the third *Polaroid* factor, proximity of the products, which together with the first two factors have been characterized as "perhaps the most significant in determining the likelihood of confusion," *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987).

HSC's product is a skin cream for women to apply at night. CORGL's product is a skin cream for women to apply at night.[2] At first blush, indeed at second blush, the factor of proximity of the products would appear to weigh heavily in HSC's favor.

Nevertheless, CORGL argues that the products are different "in many important respects." Pre-hearing brief at 14. CORGL says that ESSENCE OF TIME is brown in color, whereas TIMELESS ESSENCE is white. CORGL says further that HSC is touted for its peat moss content, whereas TIMELESS ESSENCE "employs a patent molecule, MPG ..." *Id.* Lastly, CORGL says that TIMELESS ESSENCE is priced higher than ESSENCE OF TIME.

There is no substance to these arguments. The brownish shade of ESSENCE OF TIME, noticeable enough when the cream is in the jar, disappears as soon as it is applied to and absorbed by the skin; the white colored TIMELESS ESSENCE is similarly effaced when thus applied. As for the differing ingredients, it is a rare cosmetics manufacturer who does not claim that its product contains something special. To be sure, peat moss sounds a little more, well, earthy than a "patented molecule"; but the difference is hardly sufficient to disguise the fact that these two skin creams, packed in their little jars, are highly similar products.

Nor is the difference of price of the products significant. The most that can be said for CORGL on that score is that TIMELESS ESSENCE retails for $35 for a 1.7 ounce jar, while on a day when ESSENCE OF TIME is sold on television with maximum price discounting and application of coupons, the price can fall as low as $15.80 for a 2 ounce

**2.** ESSENCE OF TIME skin cream is packaged in a box which describes the substance as "night skin conditioning creme for all skin types." As noted in text, the jar and box used for TIMELESS ESSENCE cream displays the phrase "Night Recovery Cream."

jar (although the evidence, including the tape of the television offers, indicates that ESSENCE OF TIME is most frequently offered at $19.75). That price differential, while considerable, is not enough to alter reality: the factor of proximity of product weighs strongly in HSC's favor.

*(4) Bridging the Gap*

 This factor "turns on the likelihood of whether the senior user will enter the market of the junior user," *Nikon* at 95. The term "bridging the gap" reflects the senior user's interest "in preserving avenues of expansion and entering into related fields." *C.L.A.S.S. Promotions, supra,* at 18. The factor militates in favor of the likelihood of confusion "if, in a case where there are certain product differences, the senior user of a trademark proves an intent to expand its traditional activities and enter into a related field occupied by the junior user." *Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 385 (S.D.N.Y.1985), *aff'd* 788 F.2d 3 (2d Cir.1986).

Where, as here, the products are virtually identical, questions of bridging the gap do not arise. This particular *Polaroid* factor does not play a part in the present calculus.

*(5) Sophistication of Consumers*

I combine consideration of this *Polaroid* factor with a related argument which CORGL makes with respect to differences between the parties' marketing and advertising channels. While the latter factor is not specifically mentioned in *Polaroid,* the list contained in that case was never intended to be exhaustive.

CORGL argues that "[t]he contrast between the parties' marketing and advertising channels could scarcely be more stark." Post-hearing brief at 4.

In support of that assertion, CORGL points out that HSC sells its ESSENCE OF TIME product by offering it on television. A consumer may place an order only by telephoning in at the time the product is being displayed on the television screen. That, at least, is HSC's primary marketing technique. It also operates as a mail order house, offering ESSENCE OF TIME along with other discounted products to HSC club members through retailing publications (such as the *Bargaineer Extra,* and *Home Shopping Values* ). HSC also liquidates and markets products through outlet stores open to its club members, frequently offering further discounts in the form of coupons. Rarely, HSC advertises its products in publications such as the *National Enquirer,* addressed to broader audiences.

By way of contrast, CORGL sells its TIMELESS ESSENCE as part of the Charles of the Ritz line through department stores and "better independent drugstores" [3], where "demonstrators" knowledgeable about the product and the line are available to advise consumers about their purchases. CORGL disdains to use alternative methods, such as infomercials [4] or the services of home shopping television stations. CORGL has advertised and promoted TIMELESS ESSENCE as part of the Charles of the Ritz line through television and newspaper advertising, in-store collateral pieces, and gifts with purchase offers sent out by department stores to their customers.

[6] CORGL contends, with evident self-satisfaction, that its promotional materials contrast sharply with those employed by HSC. CORGL says in its post-hearing brief at 8:

> Particularly striking are the differences between Home Shopping's televised sales pitches and Charles of the Ritz' network advertising.

---

3. It is not clear what CORGL means by a "better" drug store. Geoffrey Donaldson, a CORGL executive, was asked at his deposition what the difference was "between a drug store and a better independent drug store." He answered: "One is better than the other, I guess. A drug store is a drug store. And all of the drug stores that we would sell would be better drug stores." Tr. 45.

4. An "infomercial" is a half-hour long television program which starts out looking like a real program, but is in effect an extended commercial for a product or product line. These presentations contain no info and a great deal of mercial. A steady diet of infomercials is equivalent to life in the Fifth Ring of Hell.

There are indeed differences between the televised marketing techniques for these two products. The female television "hosts" on the HSC telecasts are shown working in a basic studio setting; they are not celebrities, at least to my knowledge; and their technique partakes of the persistent buzzsaw of the high-pressure salesperson. Kathie Lee Gifford, a celebrity of sorts and married to another (Frank Gifford, the former football player and present sports commentator), is relatively refined in appearance and diction, and was photographed in what appears to be an attractive home setting. CORGL gilds the lily a bit, however, when it contrasts HSC's "televised sales pitches" with its own "network advertising." CORGL's "network advertising" consists of "televised sales pitches" by Kathie Lee Gifford. One pitch may be hardball and the other softball, but both parties use television to make sales pitches (or to display "advertising", if one prefers more genteel phrasing).

Proceeding from these observations concerning the differences in the parties' marketing and advertising channels, CORGL arrives at the closely related *Polaroid* factor of consumer sophistication. CORGL argues that the sort of consumers who watch HSC's programs would not be likely "to mistake Charles of the Ritz' TIMELESS ESSENCE Night Recovery Cream for ESSENCE OF TIME when they encounter Charles of the Ritz' product in the department and better independent drug stores where it is sold." CORGL describes consumers of the Charles of the Ritz product lines as individuals who are "quality oriented," "traditional," "classic," "brand loyal," and "discerning." Post-hearing brief at 17 (quoting the deposition of Holly Clothier, a former employee of Revlon which at the pertinent times owned CORGL). Based on these considerations, CORGL concludes:

> There simply is no likelihood that such a consumer—encountering Charles of the Ritz' TIMELESS ESSENCE Night Recovery Cream through the marketing and advertising described ... above—would mistake Charles of the Ritz' clearly brand-ed product for a product offered by Home Shopping using markedly different means. *Id.* at 17–18.

"Likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers." *Gillette* at 575. "Sophistication of consumers usually militates against a finding of likelihood of confusion." *Centaur Communications, Limited v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987). "[T]he more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Nikon* at 95 (citing and quoting *Bristol–Myers Squibb Co. v. McNeil–P.P.C, Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992)). "Generally, purchasers of small items like lip balm are considered casual purchasers prone to impulse buying," whereas "[r]etailers are assumed to be more sophisticated buyers and thus less prone to confusion." *Gillette* at 575–76.

The combined thrust of CORGL's marketing and consumer arguments is that HSC's marketing is so 'uncouth, and CORGL consumers so couth, that no likelihood of confusion exists.

I think this is a doubtful proposition. There is no empirical evidence to support it. Counsel for HSC said at oral argument that

> we did request during the course of discovery information regarding demographics with respect to the Charles of the Ritz customers and production. That was refused by the defendant as irrelevant. So we do not know what extent they can argue about whether customers are different.

I was never asked to resolve that discovery dispute, and accordingly take the record as I find it. Certain realities of contemporary marketing may, nonetheless, be judicially noticed. Technological changes bring about revolutions in the marketing of consumer products to American homes. The Sears Roebuck catalogue once bestrode that world like a Colossus. It is gone now, with early editions becoming collector's items, nostalgic evocations of times past. Today the cries of

the shopping mall and the catalogue are heard across the land. In my own home, I observe the extent to which shopping by mail-order catalogue has replaced expeditions to stores like Macys, Gimbels, Alexanders, and B. Altman (the latter three having also disappeared from the retailing scene).

The trade press is aware of these changes. *Cosmetic World* is a magazine published weekly since 1969 for the cosmetic and fragrance industry, manufacturers and retailers. An article in a recent issue, read to Donaldson at his deposition and with which that CORGL executive expressed agreement, was entitled "Beware Retail Myopia." The author of the article, one Wendy Liebman, criticized as unrealistically narrow an unidentified drug chain executive's definition of his competition as "any retailer who sells similar merchandise in a similar environment at a similar price." The article continues:

> Wendy Liebman points out that the consumer views shopping experiences in different and broader terms. Perceptively, she puts herself in the consumer's shoes. Shoppers shop everywhere and anywhere and not merely in a retail store. Consumers shop for merchandise and services through a broad range of distribution channels and not at one price range.
>
> In her lucid way, Ms. Liebman points out that the Saks Fifth Ave. and Bergdorf customer "now also shops at the Gap and at Wal-Mart, through the L.L. Bean catalogue and over the Home Shopping Network." She pointedly refers to convenience, the detailed explanation of the product, ease of ordering, prompt delivery and a returns policy with "no questions asked."

To that entirely sensible analysis I add the fact that, as the record reveals, J.C. Penney's is a retail department store chain with about 440 branches nationwide. It is frequently found at shopping malls. The chain accordingly has a lower "upscale" ranking than emporiums like Bloomingdale's, Bergdorf Goodman or Neiman-Marcus.

One commentator has said that "there is normally no likelihood of confusion where goods sold to the trade and to consumers respectively do not ultimately reach the same market or the same purchasers. Even though goods which are somewhat similar in nature are sold under similar marks, the fact that the channels of trade in which they move are mutually exclusive may be sufficient in itself to interdict any likelihood of confusion." But he adds the caveat that "sometimes goods are so closely related that confusion is likely even though they are distributed to different customers through mutually exclusive channels of trade." 3A Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, (4th ed. 1992) at 435–36. The case cited for the latter proposition, *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214 (5th Cir.1985), found a likelihood of confusion between technologically complex, expensive batteries and inexpensive batteries used for different purposes, "notwithstanding the lack of competition between the products, the disparity in the channels of trade, and the lack of any customer overlap." 3A Callman at 436.

In the case at bar, the channels of trade for these competing skin creams are not mutually exclusive; and the disparities between them are not as great as in *Marathon*.

In short, I am not persuaded by CORGL's contention that TIMELESS ESSENCE consumers would be unaware of, and consequently not confused by, the ESSENCE OF TIME product line marketed by HSC over television. On the contrary, I think it more likely that a significant number of those who shop at stores like J.C. Penney's are also familiar with the home television marketing channels and make some use of them. Indeed, as noted in the discussion of actual confusion *infra*, at least one consumer saw the Kathie Lee Gifford television commercial for TIMELESS ESSENCE and telephoned HSC to place an order for ESSENCE OF TIME, believing the two products to be the same.

I find from the present record that the consumers of these competing skin creams are relatively unsophisticated casual purchasers, prone to impulse buying. The factor of consumer sophistication favors HSC rather than CORGL.

774

### (6) Quality of Defendant's Product

The Second Circuit in *Nikon* at 95 accepted the argument that "unless the junior user's product is inferior, the quality factor does not weigh in favor of the senior user." *Gillette* is to the same effect; *see* 984 F.2d at 575. HSC does not allege that CORGL's product is of inferior quality. This is not a factor.

### (7) Actual Confusion

■ "Although [evidence of actual confusion] is not necessary to show likelihood of confusion, its lack may under some circumstances be used against a plaintiff." *Nikon* at 95 (citing and quoting *Hasbro v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988)). But the presence of past or present confusion supports, logically enough, a conclusion of future confusion, and has been recognized by the Second Circuit as an important factor in determining its likelihood. *See, e.g., Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (7th Cir.1980), which cited the Seventh Circuit's opinion in *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1330 (7th Cir.1977) ("While the test of infringement is the likelihood of confusion, which can be proven without any evidence of actual confusion, such evidence, if available, is entitled to substantial weight.").[5]

■ Typically, an infringement plaintiff undertakes to prove actual confusion between its products and the defendant's in two ways: anecdotal evidence of particular incidents and market research surveys. In the case at bar, HSC has not conducted a market research survey. It offers anecdotal evidence of actual confusion.

Such evidence is found in the deposition of Benedict White, an executive employed by Home Shopping Network, a company affiliated with HSC, who participates in intra-company arrangements for telemarketing by HSC. HSC also offers proof of actual confusion in a series of affidavits which accompanied its original motion for a preliminary injunction in the Middle District of Florida, prior to the transfer of the case to this Court.

It is useful, before considering the evidence of actual confusion, to consider the threshold question of whether these affidavits may properly be considered by the Court.

In a careful review of Second Circuit authority, Judge Canella said in *Carrera International Corp. v. Carrera Jeans Ltd.*, 481 F.Supp. 820, 822 (S.D.N.Y.1979):

> While there is precedent for the issuance of a preliminary injunction in trademark cases upon affidavits and pleadings alone, *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 500 (2d Cir.1962), the Second Circuit has also repeatedly cautioned against issuing preliminary restraints solely on the basis of affidavits where relevant factual issues exist. *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197, 1204 (2d Cir. 970) and cases cited. Of course, where the defendant willingly joins in a battle of affidavits and requests no further factual development, it cannot later complain that the injunction was based on an inadequate record, *Semmes*, at 1205; *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir.1977); but here CJ makes timely assertion that the affidavits are insufficient.

Judge Canella then considered the contents of the plaintiff's affidavits and exhibits, and concluded that "a more detailed record must be made." *Id.* at 825.

It is apparent that the plaintiff in *Carrera* sought a preliminary injunction solely on the basis of the pleadings, affidavits, and attached exhibits. In the case at bar, the initial exchange of affidavits submitted by

5. This view is generally held among the circuits. *See, e.g., Squirtco v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980) ("Likewise, actual confusion is not essential to a finding of trademark infringement although it is positive proof of likelihood of confusion."); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971) ("there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion."). Counsel for HSC cite both these cases in their Proposed Conclusions of Law at 3–4, but inaccurately indicate that they are from the Second Circuit, a lapse in professionalism which this Court does not appreciate.

both parties in the Middle District of Florida was followed by extensive discovery by deposition in this Court. Indeed, the discovery was more extensive than the plaintiff would have preferred: over HSC's objection, I permitted CORGL to take additional discovery depositions of HSC on specified issues shortly before counsel argued the case. On its final submission, CORGL also asks me to consider affidavits and exhibits generated by certain of its own witnesses.

It is therefore fair to say, with Judge Canella in *Carrera*, that to a significant extent "the defendant willingly joins in a battle of affidavits." Moreover, CORGL had the opportunity to notice depositions of the affiants HSC produced on the issue of actual confusion, but did not do so. Instead, CORGL contents itself with attacking the credibility of certain of those witnesses (Joanne Benjamin and Jules Schlesinger) on the basis of their relationship with HSC.

In these circumstances, I may consider the substance of the affidavits in question.

Turning to the evidence of actual confusion, White testified in a discovery deposition conducted by counsel for CORGL:

A. Well, I have had personal experience myself of being in the field. One of the other areas that I am extremely involved in with Home Shopping is I do all of the celebrity-related products. I bring all of the celebrities into Home Shopping.

I have had various celebrities contact me or when I have been out in L.A. come up to me and ask me if I had signed Kathie Lee Gifford on as a Home Shopping Club representative. I have had agents call me and ask me if I had signed Kathie Lee Gifford up.

I have had one agent call me up congratulating me that I signed Kathie Lee Gifford up.

I have had one agent call me up congratulating me that I signed Kathie Lee Gifford up to represent Home Shopping Club with the product. That happened—that was like as much as three weeks ago, four weeks ago, whenever you stopped running the program.

People have come up to me, presented me skin care products, other vendors, and said, "Is this like the one that you are doing with Kathie Lee Gifford?"

Tr. 102–03.

White also testified that relatives of his in New York had called him up to ask if they could get ESSENCE OF TIME at J.C. Penney's instead of ordering it over the Home Shopping Club. Tr. 104.

White was referring in his testimony to the series of television commercials, noted *supra*, in which Kathie Lee Gifford extolled the virtues of the TIMELESS ESSENCE cream.

Counsel for CORGL made no effort during White's deposition to question or explore this testimony, by asking the names, dates, or particulars of the unidentified celebrities, agents, and relatives to whom White referred. Accordingly I take the testimony at face value.

In addition to White's testimony, HSC relies upon six affidavits which it submitted to the Middle District of Florida in support of its original application for a preliminary injunction. These affidavits were all executed in July 1992. The affiants are Ruth Bennett; Eva Benmark; Hal Markowitz; Jules Schlesinger; Janet Finkelstein; and Joanne Benjamin.

Bennett and Benmark are employees of a subsidiary of Home Shopping Network, Inc., the parent of plaintiff HSC. Bennett is a "quality control supervisor of outbound telemarketing services sales representatives employed and acting for HSC." Affidavit, ¶ 2. Her responsibilities included placing telephone calls to customers who purchased HSC products in the past, or receiving telephone calls from new customers referred to her department by another office of HSC. *Id.* Toward the end of May or beginning of June 1992, Bennett was receiving incoming calls because the telemarketing representatives were in a meeting. She received a call from a potential customer who told Bennett that she wished to purchase TIMELESS ESSENCE. Believing the customer was confused, Bennett told her that the correct name of the product was ESSENCE OF TIME,

*id.*, ¶ 7, whereupon "[t]he customer got indignant with me and informed me that she had definitely seen the product on television and that I was wrong. It was called TIMELESS ESSENCE. She further stated that Kathie Lee Gifford was advertising the product." *Id.* ¶ 8. Thereafter Bennett saw a television commercial for TIMELESS ESSENCE, promoted by Gifford, which she reported to her supervisor.

Eva Benmark performed duties comparable to those of Ruth Bennett. During the second or third week of June 1993 Benmark placed a call to a woman who had previously purchased cosmetic products from HSC, including, Benmark believes, ESSENCE OF TIME cream. Affidavit ¶ 7. Benmark asked the customer how she liked the products recently sold to her; the customer's response is not stated. Benmark then asked the customer whether she would like to purchase any other products; and at that point, "the customer indicated an interest in purchasing a product which she called TIMELESS ESSENCE." Benmark, believing the customer was confused as to the name of the product, told her that it was called ESSENCE OF TIME. Benmark made a sales pitch to the customer about ESSENCE OF TIME, but no purchase resulted. Benmark subsequently learned of the existence of TIMELESS ESSENCE, and reported this telephone call to her supervisor.

None of the other four affiants is an HSC employee, although two of them have close business relationships with that company.

Jules Schlesinger is the president of Rubigo Cosmetics, Inc., a cosmetics distributor with offices in New Jersey. Joanne Benjamin is the president of ACI, Inc., a cosmetics manufacturing and marketing corporation with offices in New York City. ACI, in a joint venture with Rubigo, formulates, manufacturers, packages and ships cosmetic products pursuant to a contract with HSC, including products marketed by HSC under the ESSENCE OF TIME trademark. That relationship has existed since late 1990.

About three weeks prior to the execution of his affidavit on July 21, 1992, Schlesinger received a telephone call from one of his suppliers, who said that he had seen the Kathie Lee Gifford television commercial for a product called TIMELESS ESSENCE, and stated further "that upon seeing the commercial he thought it was a new commercial for ESSENCE OF TIME." Affidavit, ¶ 3. When Schlesinger told his supplier that the product was advertised for Charles of the Ritz, the supplier "became confused and did not know what the relationship was to the product manufactured by Rubigo." *Id.;* ¶ 4.

Joanne Benjamin says in her affidavit that shortly after June 21, 1992, she received a telephone call from Janet Finkelstein, who said she had called to congratulate Benjamin "on the new advertising campaign featuring Kathie Lee Gifford promoting the ESSENCE OF TIME cosmetic line of products." Affidavit, ¶ 4. Benjamin informed Finkelstein that the advertisement was not for ESSENCE OF TIME products, but was being run by Charles of the Ritz for a product called TIMELESS ESSENCE. *Id.* at ¶ 5. Sometime prior to Finkelstein's call, Benjamin had received a telephone call from Hal Markowitz of Beauty Labs, Inc., who said "that he had seen that Kathie Lee Gifford was being featured in advertising for ESSENCE OF TIME and called me also to congratulate me on the new campaign as well as to discuss other possible promotions using Regis Philbin [Gifford's constant television companion]." *Id.*, ¶ 6.

After looking into the matter, Benjamin called Markowitz back and told him that he had seen an advertisement for TIMELESS ESSENCE. *Id.*, ¶ 7

The last two affidavits are those of Finkelstein and Markowitz. Up until April 1992, Finkelstein worked in the Gianni Versace Boutique in Bergdorf Goodman, a major upscale department store in New York City. Finkelstein was familiar with the ESSENCE OF TIME skin cream marketed and distributed through HSC. She says in her affidavit, verified July 15, 1992, that "recently" she saw an advertisement on television starring Kathie Lee Gifford for a skin cream. "At the time, I thought the advertisement was for the ESSENCE OF TIME product that I was familiar with." Affidavit, ¶ 5. Finkelstein saw the commercial several times, "and con-

tinued to believe that the product being promoted was the ESSENCE OF TIME product." She telephoned "ACI, Inc." (presumably Joanne Benjamin) regarding the product she had seen on television, and during the conversation "commented on ACI having Kathie Lee Gifford as a spokesperson." Finkelstein was thereupon informed "that, to my surprise, ... I had been mistaken, and that the product I had seen on television did not come from ACI." *Id.*, ¶ 6.

Hal Markowitz is the co-founder and chairman of Beauty Labs, Inc., a New York corporation, which markets and distributes cosmetics products. He has been in the cosmetics business for 25 years and has been familiar with the ESSENCE OF TIME skin cream marketed and distributed through HSC for a considerable time. Affidavit ¶¶ 1-4. In an affidavit verified on July 21, 1992, Markowitz says that "recently" while watching television, he saw an advertisement starring Kathie Lee Gifford for a skin cream. "I thought the advertisement was for ESSENCE OF TIME." Markowitz called ACI regarding the television advertisement, "because I was interested in doing some work with Regis Philbin. When I commented on ACI's having Kathie Lee Gifford as a spokesperson, the person I was talking to informed that I was crazy, and that ACI did not have any advertisements starring Kathie Lee Gifford." *Id.*, ¶ 6. Markowitz describes himself as "puzzled by the entire affair"; later, the person at ACI (again presumably Benjamin) "called me back and explained that what I had seen on television was an advertisement for TIMELESS ESSENCE, a product marketed and distributed by a competitor of ACI." *Id.*, ¶ 8.

These accounts of actual confusion are not inherently implausible. They have the ring of truth. To be sure, Bennett and Benmark, as employees of HSC, must be regarded as interested witnesses. A degree of interest also is demonstrated with respect to Schles-

inger and Benjamin, as the result of their contractual relationships with HSC. But Finkelstein and Markowitz, from all that appears, have no such interest; and they corroborate Benjamin's account of the expressions of actual confusion which they communicated to her.

The inherent plausibility of these accounts, including the deposition testimony of White, is strengthened by the several references to HSC being "congratulated" about the Kathie Lee Gifford television commercials. There is a considerable difference, previously noted, between the manners in which the two skin creams are promoted on television. The point in connection with the actual confusion factor is that, given these circumstances, the individuals referred to in HSC's evidence of actual confusion believed that HSC was taking a step up in class by retaining Kathie Lee Gifford to tout its ESSENCE OF TIME product. The fact that Gifford was in fact touting a CORGL competing product reflects confusion on the part of these individuals.

The factor of actual confusion weighs in favor of HSC.[6]

### (8) Bad Faith

■ This factor of the *Polaroid* test considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Gillette* at 575 (citing and quoting *Lang*, 949 F.2d at 583, in turn quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)).

■ In the case at bar, there is no evidence that CORGL acted in bad faith, as that phrase is defined in trademark infringement cases. CORGL executives testified without impeachment or contradiction that the mark TIMELESS ESSENCE sprang from that company's prior history marketing comparable products; and that they were unaware of HSC's ESSENCE OF TIME products when

---

**6.** That is so, even making allowance for the fact that "Charles of the Ritz" was a familiar name in cosmetics a number of years before HSC came into being. Nonetheless, HSC is the senior user of two similar names for the same product; and these circumstances may give rise to an actionable claim of "reverse confusion," with its poten-

tial "to injure the reputation of the prior user of the mark by causing potential customers to consider it a trademark infringer." *Gillette* at 571. The *Polaroid* analysis is the same in either case. The evidence in the case at bar indicates direct, not reverse, confusion.

the decision was made to market TIME-LESS ESSENCE. I credit that testimony.

After Donaldson and Clothier; the CORGL executives in question, selected TIMELESS ESSENCE, they advised CORGL counsel George Long of that selection, so that Long could conduct a trademark search. Long gave CORGL a favorable opinion and the company began to use the mark. *See* Clothier deposition at 83; Donaldson deposition at 173–75.

At the hearing counsel for HSC contended that this testimony waived the attorney-client privilege. HSC's counsel demanded a copy of Long's written opinion, and sought to re-serve the right to cross-examine that attor-ney on the underlying facts and circum-stances. I deny that request. Within the context of CORGL's bad faith, the probative fact is that the company sought the opinion of counsel and obtained it before making use of the TIMELESS ESSENCE mark. The totality of the circumstances, including CORGL's substantial presence and activity in the field before the advent of HSC, argue against a finding of bad faith. In any event, HSC has failed to prove bad faith on the part of CORGL. Long's awareness of the ES-SENCE OF TIME trademark as the result of his search "does not necessarily give rise to an inference of bad faith, 'because adop-tion of a trademark with actual knowledge of another's prior registration of a very similar-ly mark may be consistent with good faith.'" *Gillette* at 575 (citing and quoting *Lang*, 949 F.2d at 584)).

In short, HSC has not proved bad faith on the part of CORGL. *Compare Gillette* at 575 ("WWW has not put forth any evidence that Gillette intended to promote confusion between the products or appropriate WWW's good will and therefore has not shown any bad faith on Gillette's part.").

Balancing of the Factors

■ Although HSC has not proved that CORGL acted in bad faith, it has proved the likelihood of consumer confusion between these two competing products. That conclu-sion follows from the combined effect of the moderate strength of HSC's trademark, the degree of similarity between the marks, the close proximity of the products, the relative lack of sophistication of the casual purchas-ers of these products (at least has revealed by the present record), and the significant evidence of actual confusion, on the part of individuals in the trade and actual consum-ers.

Irreparable Harm

The first argument CORGL makes in op-position to HSC's motion for a preliminary injunction is that HSC has failed to show that the marketing of CORGL's TIMELESS ESSENCE cream has irreparably harmed HSC. CORGL contends that:

> To the extent that there has been any change in the volume of sales of ES-SENCE OF TIME, both before and after the introduction of CHARLES OF RITZ' product in May/June 1992, these fluctua-tions are directly proportional to the level of support Home Shopping has given the product during its on-air broadcasts and the number of discount coupon orders shipped by the company during this time period.

Post-hearing brief at 1–2.

In support of this contention, CORGL points to Ex. 150, a research and analysis report prepared by an HSC staff member and dated December 15, 1992, which depicts in statistics and graphs on a monthly basis the correlation between "floor sales" of ES-SENCE OF TIME CREAM (measured in dollars), the minutes of television air time devoted to the product, and the use of cou-pons offered to discount the product. With respect to the latter factor, the report notes that "four of the five months in which the highest floor sales occurred were also the months in which the percentage of coupon orders shipped were highest."

Before considering the element of irrepa-rable injury, it is necessary to define the present state of the litigation. That is be-cause the parties' briefs reflect some uncer-tainty as to whether this decision will resolve HSC's motion for a preliminary injunction, or a motion for a permanent injunction follow-ing the functional equivalent of a plenary trial on the merits.

The former is the correct perception. The status of the case when transferred from Florida was that of a pending motion for a preliminary injunction. Since that time depositions had been taken in addition to the original affidavits, but that is a common method of supplementing the record in preliminary injunction motions for trademark infringement.[7]

Accordingly the case is governed by the traditional factors applicable to preliminary injunctions, including cases of alleged trademark infringement, as illustrated by *Church of Scientology International v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2d Cir.1986):

> A preliminary injunction should be granted where the moving party demonstrates (1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor.

In the case at bar, the conclusion that HSC has shown likelihood of consumer confusion satisfies the first prong of the criteria addressing the merits, namely, the probability of success. But it remains necessary to consider irreparable harm, which a plaintiff must show in any event.

On that issue, the Second Circuit in *Scientology* went on to say:

> For many years we have consistently held that a preliminary injunction should usually issue when the use of a mark creates a likelihood of confusion in the consumer's minds as to the ownership or sponsorship of a product. Our cases clearly say that establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm. Proof of such confusion also serves as additional evidence with respect to the separate finding

that must be made of plaintiff's likelihood of success on the merits.

794 F.2d at 41 (citing cases).

Those rules, the Second Circuit said in *Scientology*, govern "in the ordinary case. The implication of the phrase that irreparable harm 'almost inevitably' follows from likelihood of confusion leaves the door slightly ajar perhaps for those few cases in other trademark contexts where irreparable harm does not follow." *Id.* at 42. If the district court, which denied a preliminary injunction in *Scientology*, "thought that this was one of those rare cases," it was wrong (and was reversed for its pains). *Scientology* involved infringement by a former licensee of plaintiff licensor's trademark; the Second Circuit held that "[w]hen in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic." *Id.*

One of the cases the *Scientology* court cited for the proposition that probability of confusion "almost inevitably establishes irreparable harm" is *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971) ("Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows."). *Omega* involved the use of identical names on small products (cameras) sold by many merchants, and accordingly is analogous to the case at bar.

While the instant case, unlike *Scientology*, does not pit a licensor against a former licensee, its general ruling with respect of irreparable harm is not limited to that context. In *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992), where the plaintiff author established likelihood of success on a claim of literal falseness, the court of appeals said that "a presumption of irreparable harm arises" in such cases, and went on to cite and quote *Scientology* for the proposition that "except in 'rare cases' irreparable harm 'al-

---

7. HSC offered additional affidavits and exhibits subsequent to the Court's February 3, 1993 Order, structuring the oral argument on February 11. I agree with *CORGL* that these proffers seek to enlarge the record in a manner inconsistent with the procedural history of the case. Accordingly, I have not considered that material, and it is not a part of the evidentiary record on HSCL's motion for a preliminary injunction.

most inevitably' follows from likelihood of confusion."

 In the case at bar, I conclude that the likelihood of consumer confusion as to the sponsorship of these two competing skin creams gives rise to a presumption of irreparable harm to HSC which CORGL has failed to rebut.

I do not think that HSC's marketing analysis, Ex. 150, rebuts that presumption. The graphic comparison of floor sales and air time prior to CORGL's introduction of TIMELESS ESSENCE cream in June 1992 shows a quite close correlation between floor sales and air time: the less the air time devoted to ESSENCE OF TIME CREAM, the lower the sales. However, in August, September and October 1992, a significant gap opens up between the minutes aired (the higher figure) and the amount of sales (the lower figure). CORGL's shipping records show that August and September 1992 were the biggest months for orders and shipments of TIMELESS ESSENCE. HSC brought sales of ESSENCE OF TIME up again in November 1992 by increasing the air time and coupon discounts; but by that time, CORGL had ceased national television advertisements for TIMELESS ESSENCE.

I am unable on these facts to draw the conclusion that CORGL urges, namely, that its introduction of TIMELESS ESSENCE into the market in June 1992 and its national advertising of that competing product had no effect upon the sales of HSC's product. On the contrary, I find that the competing TIMELESS ESSENCE line had a depressing effect upon the sales of HSC's ESSENCE OF TIME, but that it would be impossible to quantify HSC's loss with any precision. Precisely because that is true, HSC has shown irreparable injury.

## CONCLUSION

For the foregoing reasons, HSC is entitled to a preliminary injunction.[8]

8. Although HSC's complaint also pleads claims under common law and Florida law, the parties did not address them in briefs or argument. I

Counsel for plaintiff are directed to settle an Order of Preliminary Injunction consistent with this Opinion on ten (10) days notice.

It is SO ORDERED.

grant a preliminary injunction under the Lanham Act.